IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JASMIN CHEBBANI,<br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>UNITED STATES OF AMERICA<br>DEPARTMENT OF AGRICULTURE,<br>　　　　　　Defendant. | :<br>:<br>:<br>:   Civil No. 5:21-cv-04298-JMG<br>:<br>:<br>:<br>: |

**MEMORANDUM OPINION**

**GALLAGHER, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**May 1, 2023**

**I.　　OVERVIEW**

　　This action arises from an automobile accident that occurred on October 31, 2019. The accident involved Plaintiff Jasmin Chebbani ("Chebbani") and Tami Lynn Shoemaker ("Shoemaker"), who was an employee of the United States government and was operating a vehicle owned by the government. Plaintiff and Defendant seek to introduce expert testimony to assist the fact finder, in this case the Court, in determining Plaintiff's damages she claims are a result of the accident. Plaintiff offers Dr. Scott J. Pello ("Dr. Pello"), a board-certified neurologist and pain medicine specialist who conducted an examination of Plaintiff. Defendants offer accident reconstruction expert Russell Kolmus ("Kolmus") and biomedical engineering expert Dr. Robert J. Nobilini ("Dr. Nobilini"). Plaintiff has filed *Daubert* motions seeking to preclude the opinions, report and testimony of Kolmus and Dr. Nobilini. *See* Pl. Mot. to Preclude Expert Test. Of Russell Kolmus, ECF No. 23; Pl. Mot. to Preclude Expert Test. Of Dr. Robert J. Nobilini, ECF No, 24. Defendant has filed a motion to preclude the testimony of Dr. Pello. *See* Def. Mot. to Preclude Test. of Dr. Pello, ECF No. 34. The Court will address the parties' motions in one omnibus *Daubert* opinion. For the reasons that follow, Plaintiff's motions are denied. Defendant's motion is denied in part and

granted in part.

## II.     BACKGROUND

This case arises from a motor vehicle accident that took place on October 31, 2019 in Upper Merion Township in Montgomery County. Amend. Compl., ECF No. 5 at ¶ 12. At the time of the accident, Plaintiff was driving a 2010 Mazda 3. Def. Resp. in Opp. To Pl. Daubert Motions, ECF No. 29 at 1. The other vehicle involved in the accident was a 2017 Ford Focus driven by Shoemaker, a United States government employee. *Id*. Shoemaker's vehicle, which was owned by the United States government, struck the rear bumper of Plaintiff's vehicle. Amend. Compl. at ¶¶ 13-14. The parties do not dispute the accident occurred, or that Shoemaker was at fault. *See* ECF No. 29 at 2. The parties do, however, dispute the damages that Plaintiff alleges she suffered and continues to suffer as a result of the accident. To that end, the parties have offered expert testimony from Kolmus, and Dr. Nobilini, and Dr. Pello.

Kolmus earned a master's degree from Cornell University in civil engineering and is registered as a "professional engineer" in several states, including Pennsylvania. *See* ECF No. 29, Ex. A at 30 (ECF No. 29-1). Since 2012, Mr. Kolmus has served as President and Engineering Consultant for Kolmus Consulting, LLC, which "provides forensic investigations, reporting including expert witness testimony[,] civil/roadway/bridge structural, design/inspection/construction engineering services, and project management." *Id*. In this role he has also investigated automobile accidents and their causes. *Id*. In total, Mr. Kolmus has over 40 years of experience in engineering. *Id*. Based on his analysis, which included viewing photographs of the vehicle, stiffness coefficients derived from United States Department of Transportation testing and the use of the software EdgeFX which is commonly used for accident reconstruction, Kolmus determined Shoemaker was operating the Ford Focus at a speed of less than three miles per hour when the accident occurred.

Dr. Nobilini earned a doctorate degree from Drexel University in the field of mechanical

2

engineering, with a specialty in biomechanics. *See* ECF No. 29, Ex. B, at 15 (ECF No. 29-2). He has worked in the engineering field for over thirty years, and has served as president of 4N6 Consulting, LLC, which "performs mechanical and biomechanical engineering investigations and analyses of accidents, [including] the relationship of trauma to injury." *Id.* Dr. Nobilini opined that the accelerations Plaintiff experienced during the accident were "well within the range of accelerations that she would experience during everyday non-injurious activities of daily living." *Id.* at 8. Dr. Nobilini then considered scientific studies involving "the dynamics of vehicle occupants during rear-end motor vehicle accidents," concluding the participants in the studies did not have any permanent injuries, and that based on these studies the impact experienced by Plaintiff was not consistent with the injuries that she has claimed. *Id.* at 8-10.

Dr. Pello is a board-certified neurologist and pain management specialist who examined Chebbani on October 11, 2022. Following the examination and a review of medical records from 2015 through 2021, Dr. Pello diagnosed Chebbani with "post-concussive syndrome, posttraumatic headaches, ocular motor dysfunction, cervical sprain/strain, left shoulder sprain/strain-improved, and myofascial pain." Def. Mot. to Preclude Test., ECF No. 34, Ex. C at 3 (ECF No. 34-3). Dr. Pello attributed his diagnoses to the accident that occurred on October 31, 2019. *Id.*

## III.   LEGAL STANDARD

Under the Federal Rules of Evidence, district courts must act as the gatekeepers of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); Fed. R. Evid. 702. This gatekeeping role exists in both jury trials and bench trials. *UGI Sunbury LLC v. Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) ("Rule 702 applies whether the trier of fact is a judge or a jury."). However, during a bench trial a district court "retain[s] 'latitude' to decide 'how' to apply [the requirements of expert opinion testimony]." *Id.* at 833 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

3

152 (1999).

A witness is *qualified* to provide expert testimony only if the witness has "specialized expertise" in the testimony's subject matter. *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).[1] A witness's testimony is *reliable* only if it is founded upon "good grounds." *UGI Sunbury LLC*, 949 F.3d at 834; Fed. R. Evid. 702 (requiring that expert testimony be "based on sufficient facts or data" and be derived from "reliable principles and methods" that have been "reliably applied . . . to the facts of the case."). And a witness's testimony *fits* a case only if it would help the trier of fact to understand the evidence or determine a fact in issue. *UGI Sunbury LLC*, 949 F.3d at 835 (quoting Fed. R. Evid. 702); *see United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) ("fit is [primarily] a relevance concern") (internal quotation marks omitted).

The Federal Rules of Evidence reflect a liberal policy of admissibility for expert testimony and embody a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 780 (3d Cir. 1996) (quoting *DeLuca v. Merrell Dow Pharm., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990)); *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). "Exclusion of expert testimony is the exception rather than the rule because vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Keller v. Feasterville Family Health Care Ctr.*, 557 F. Supp. 2d 671, 674 (E.D. Pa. 2008) (quoting Fed. R. Evid. 702, advisory committee's notes) (citing *Daubert*, 509 U.S. at 595). But expert testimony must satisfy the requirements set out above to be admissible. *UGI Sunbury*, 949 F.3d at 832–33. The burden to establish that each requirement is satisfied by a preponderance of the evidence rests with the party offering the expert testimony. *See Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir.1999).

---

[1] The parties do not dispute the qualifications of the three experts.

4

IV.     ANALYSIS

The parties in this case have argued the opinions of Kolmus, Dr. Nobilini and Dr. Pello are unreliable.  "[T]he inquiry as to whether a particular scientific technique or method is reliable is a flexible one."  *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 (3d. Cir. 1994).  "[T]he relevant reliability concerns may focus upon personal knowledge or experience."  *Kumho Tire Co.*, 526 U.S. at 150.  The Third Circuit "has interpreted 'reliability' to mean that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable."  *Elgert v. Siemens Indus., Inc.*, No. CV 17-1985, 2019 WL 1294819, at *5 (E.D. Pa. Mar. 20, 2019) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (internal citations omitted)).

So "[a] district court is directed to the following factors to determine the reliability of proposed expert testimony: '(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.'"  *Id.* (quoting *Schneider*, 320 F.3d at 405 (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 n. 8 (3d Cir. 1994)).  The Court will address the reliability of each expert in turn.

   a. **Russell Kolmus**

To reach his opinion, Kolmus reviewed 21 pieces of evidence corresponding to the automobile accident, including the photographs of the vehicles taken at the accident scene, the police report, claim for property damages, and deposition testimony of both Chebbani and Shoemaker.  *See* ECF No. 29-1 at 16-17.  Kolmus then explained how he was able to conclude that Shoemaker's

vehicle was traveling at less than three miles per hour when it struck Chebbani's vehicle. *Id.* at 12-15.

Mr. Kolmus explained how he utilized the "energy method." *Id.* at 13. Under this method, the velocity and/or speed of a vehicle may be calculated based on the damage to the vehicle. *Id.* In order to calculate the velocity and/or speed based on the damage, he considered the stiffness coefficient for the vehicles. *Id.* Kolmus explained that these stiffness coefficients "are derived from testing performed by the United States Department of Transportation, National Highway Traffic Safety Administration." *Id.* Kolmus then stated that vehicles that operate in the United States are tested for impacts to the front, side and rear, and that the front and side impact coefficients were available for both vehicles involved in this accident. *Id.* However, the rear impact coefficients were only available for the Ford Focus. *Id.* Acknowledging there were no rear coefficients for the 2010 Mazda 3 driven by Plaintiff, Mr. Kolmus stated "[regardless] we are going to use these coefficients for the Ford Focus to compare what a calculated damage looks like to the damage to the actual Ford Focus from this incident." *Id.*

Mr. Kolmus then explained his use of the Edge FX software and how he reached his findings through the software. *Id.* His explanation started with an overhead image of an undamaged Ford Focus. *Id.* He then analyzed the damage the Ford Focus would incur from impacts at different speeds. The first figure, Enclosure 7, showed damage where the maximum penetration at the front was two inches. *Id.* The damage width was 48 inches, indicating the velocity required to inflict this damage was five to six miles per hour. *Id.* Mr. Kolmus then conducted similar testing with higher levels of maximum penetration and damage widths, which showed an increasing depth of penetration and damage width as the speed of the vehicle increased. *Id.* The final enclosure Kolmus discussed showed a 22-inch depth of penetration across the entire front width of the Ford Focus. Kolmus stated the damage shown in that figure would yield a contact speed of approximately 45 miles per hour. *Id.*

Kolmus then explained how the Federal Bumper Standards factored into his analysis. *Id.* at 13-14.  Kolmus stated that under 49 CFR CH.V. part 581 – Bumper Standard, the maximum allowable damage a vehicle may incur at 2.5 miles per hour followed by an impact into a fixed collision barrier that is perpendicular to the line of travel of the vehicle, while traveling longitudinally forward, then longitudinally rearward, under the conditions of § 581.6, at 2.5 mph." *Id.* at 14.  He also included the maximum allowable damage proscribed by the Bumper Standards, and concluded that "at a velocity/speed of 2.5 miles per hour there is to be no serious damage to a vehicle." *Id.*

Kolmus then compared the photos of the two vehicles that were taken following the accident with the results of the testing conducted through Edge FX.  *Id.* at 14-15.  Kolmus noted Plaintiff's vehicle contained minor damage in the form of scrapes on the bumper, and while Shoemaker's vehicle had no damage to the bumper, it did have a crack in the grill.  *Id.* at 14.  Kolmus could not determine whether the crack was caused by the accident.  *Id.*  Considering the evidence reviewed, and the maximum allowable damage at 2.5 mph pursuant to federal regulations, Mr. Kolmus opined the damage to the vehicles relate closely to the 2.5 mph standard, and that it was reasonable that the speeds of the vehicles did not exceed 3 miles per hour.  *Id.* at 15.  Finally, Kolmus stated that damage to the vehicle would exceed that shown in the photographs if the vehicles had been traveling at a speed of 5 mph.  *Id.*

Plaintiff has challenged the reliability of Mr. Kolmus's opinion.  First, Plaintiff argues that Kolmus did not conduct a physical inspection of either vehicle involved in the accident and therefore could not observe and/or consider actual damages.  *See* ECF No. 23 at 4.  Plaintiff also argues that Kolmus's use of the computer program Edge FX and his failure to explain how the software "was able to determine an accurate and reliable depiction of front-end damage to a Ford Focus would appear at varying speeds of impact, especially without knowing the stiffness characteristics of Plaintiff's vehicle" render his opinion unreliable.  *Id.* at 5.  Finally, Plaintiff argues Kolmus

improperly opined on the Federal Bumper Standard when he stated "[c]onsequently, we see that at a velocity/speed of 2.5 miles per hour there is to be no *serious damage* to a vehicle." *Id.* at 6.

In response, Defendant states that Kolmus was unable to perform an inspection of either vehicle because both vehicles were unavailable for inspection by the time the complaint was filed in this case. *See* ECF No. 29 at 19. As to Plaintiff's argument regarding the Edge FX software, Defendant states the software, which is commonly used by experts in Kolmus's field, generates diagrams that show damage to Shoemaker's vehicle at various speeds. *Id.* at 20-21. With respect to the data utilized by Kolmus, Defendant states Kolmus entered data that was the result of calculations based on variables that included the type of vehicle involved, the "stiffness co-efficient of that vehicle," and the direction of force applied. *Id.* at 21. As to Plaintiff's argument regarding Kolmus's failure to consider the coefficient for Plaintiff's vehicle in conducting his analysis, Defendant states that Kolmus acknowledged this lack of data, and explained that regardless he would use the coefficients from the Ford Focus to compare the calculated damage with the damage from the accident. *Id.* at 22. As to Plaintiff's final argument regarding Kolmus's opinion on federal regulatory language, Defendant points to Kolmus's report, where he explains that the federal government conducts testing of bumpers to ensure no visible damage following an impact of up to 2.5 miles per hour. *Id.* at 23. And that based on Kolmus's review of the post-accident photographs of the Ford Focus, which showed no visible signs of impact, it was reasonable to conclude the impact was at "3 miles per hour or less." *Id.*

The Court finds Plaintiff's arguments unavailing. The U.S. Court of Appeals "has interpreted 'reliability to mean that an expert's testimony is admissible so long as *the process or technique* the expert used in formulating the opinion is reliable." *Elgert*, 2019 WL 1294819 at *5. As to Plaintiff's first argument concerning the physical inspection of the vehicles – Defendant states Mr. Kolmus was unable to inspect said vehicles because they were unavailable by the time the complaint was filed in

8

this case. Kolmus did, however, review 21 pieces of evidence related to the accident which he incorporated into his analysis. Kolmus then provided a thorough explanation of the application of the Edge FX software, and his analysis in this case. This explanation included data that was used in his calculations. Kolmus also explained his reasoning for his use of the Ford Focus coefficient and not the Mazda 3, noting the relevant data was not available for the 2010 Mazda 3. Kolmus stated that regardless he would use the data from the Ford Focus because he would be comparing the software calculated damage to the Ford Focus against the damage observed in the post-accident photographs. Finally, Kolmus's opinion on federal bumper damages standards is not inappropriate. As stated by Kolmus, these bumper standards are created by the federal government in ensure minimal damage at an impact of 2.5 mph. Therefore, it is not inappropriate to opine there is to be no serious damage at that speed. Accordingly, the Court finds Mr. Kolmus's opinion to be reliable. *See United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) ("[a]s long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process - competing expert testimony and active cross - examination - rather than excluded from [the fact-finder's] scrutiny.").

### b. Dr. Robert J. Nobilini, Ph.D

In his report, Dr. Nobilini explained that he relied on various materials in reaching his opinion, including the complaint, police report, photographs of the Mazda 3 and Ford Focus, depositions of Shoemaker and Plaintiff, medical records and other materials. Pl. Mot. to Preclude Test. of Dr. Robert J. Nobilini, ECF No. 24-2, Ex. A at 1. In conducting his "momentum analysis," Dr. Nobilini incorporated the opinion of Kolmus, and based his analysis on an impact speed of three mph. *Id.* at 8. For his analysis Dr. Nobilini used "a coefficient of restitution of 0.1 to 0.8 and a crash pulse of 0.150 to 0.200 second." *Id.* Dr. Nobilini provided a citation to a study conducted by Anderson, et al., to further explain the values used in the momentum analysis. *Id.*

Dr. Nobilini's analysis revealed:

> [Plaintiff's] vehicle incurred a change in velocity (delta-V) of less than between 1.68 and 2.75 mph with an average acceleration of less than 0.38 g to 0.84 g. Based upon a haversine waveform, the peak acceleration of [Plaintiff's] vehicle during the subject collision was less than 0.76 g to 1.67 g. Based upon the direction of impact the principal direction of force (PDOF) on Ms. Chebbani's vehicle was from rear-to-front.

*Id.* Dr. Nobilini opined that the accelerations Plaintiff experienced during the accident were "well within the range of accelerations that she would experience during everyday non-injurious activities of daily living." *Id.* Dr. Nobilini then provided an explanation of different levels of acceleration that human beings experience every day through sedentary and non-sedentary activities. *Id.*

Dr. Nobilini then examined scientific studies involving "the dynamics of vehicle occupants during rear-end motor vehicle accidents." *Id.* at 8-10. These studies included "rear-end crash tests with delta-v's of 5 to 8.8 mph, which is significantly greater than 2.75 mph delta-v incurred during the subject incident." *Id.* at 10. Dr. Nobilini concluded that none of these studies showed results of permanent injuries of any kind, and that based on these studies, the impact experienced by Plaintiff was not consistent with the injuries that she has claimed, with the exception of the transient neck strain. *Id.*

Plaintiff argues the report and testimony of Dr. Nobilni are not reliable because they do not provide any explanation as to "how the 'change in velocity' (delta-V) was determined, and how the 'coefficient of restitution' and 'crash pulse' were obtained." *See* ECF No. 24 at 5. Plaintiff also argues his report and testimony should be precluded because it relies on the opinions of Mr. Kolmus, which are faulty. *Id.*

The Court is not persuaded by Plaintiff's arguments. With respect to Plaintiff's first argument, as discussed above Dr. Nobilini provided a citation referencing a study conducted by Anderson et. al., which Defendant states contained an explanation of the values used in his analysis. As to Plaintiff's argument regarding the specifics of the studies cited in his report, Dr. Nobilini provides a brief

10

explanation of each of the five studies. *See* ECF No. 24-2 at 8-10. These explanations included the ages of the participants, the type of collisions tested, the speed and force experienced by the vehicle occupants, and the injuries suffered by the participants. Finally, the Court has found Mr. Kolmus's methodology rests upon good grounds, and as such has found his opinion to be reliable. Therefore the Court will not preclude Dr. Nobilini's report and/or testimony due to its reliance on Mr. Kolmus's report. Accordingly, the Court finds the opinions of Dr. Nobilini reliable. Plaintiff's motion is therefore denied.

### c. Dr. Scott Pello

Defendant seeks to preclude Dr. Pello's report and testimony on the grounds they are not reliable. Dr. Pello examined Plaintiff on October 11, 2022. *See* ECF No. 34, Ex. C at 1 (ECF No. 34-3). Prior to their meeting, Dr. Pello reviewed Plaintiff's medical records from the following providers: Einstein Hospital between July 25, 2015 through April 25, 2021; Einstein Medical Center Emergency Department from October 31, 2019 through November 3, 2019; primary care physician Jennifer Dupree, D.O., Bryan Mawr Rehabilitation Clinic, Comfort Care Chiropractic, and Rothman Orthopedics from January 3, 2020 through April 15, 2020; records from an MRI of the cervical spine dated June 3, 2020; and Bryn Mawr Physical Therapy/Occupational Therapy records from November 14, 2019 through February 5, 2020. *Id.* at 2. Following review of Plaintiff's medical records and his examination of Plaintiff, Dr. Pello diagnosed Plaintiff with "post-concussive syndrome, posttraumatic headaches, ocular motor dysfunction, cervical sprain/strain, left shoulder sprain/strain-improved, and myofascial pain." *Id.* at 3. Defendant argues Dr. Pello's opinion regarding each diagnosis is unreliable. The Court will address these opinions in turn.

#### 1. Post-Concussive Syndrome

During Plaintiff's examination, Dr. Pello conducted a neurological exam and a cognitive evaluation. *Id.* at 2. Dr. Pello found Plaintiff's gait was steady, she had sensation to light touch in

all extremities, her extraocular muscles were intact, and she successfully completed the cognitive tests he administered. *Id.* at 3. Dr. Pello noted that Plaintiff's cognitive, visual and pain symptoms had improved but that Plaintiff reported ongoing headaches and occasional memory lapses. *Id.* Dr. Pello diagnosed Plaintiff with post-concussive syndrome and attributed the diagnosis to the auto accident. *Id.* In his report he stated Plaintiff would require continued treatment of her symptoms, which would include follow up visits with a neurologist on at least an annual or biannual basis. *Id.* at 4.

At his deposition, Dr. Pello explained that post-concussive syndrome occurs "after a patient suffers a concussion injury" and "is made by the patient's subjective report, as well as clinical exam findings." *See* ECF 34, Ex. A at 49 (ECF No. 34-1). He stated that "clinical exam findings" include a combination of various symptoms, which may include "headaches, nausea or vomiting, dizziness, light or sound sensitivity." *Id.* He then stated a patient suffering from post-concussive syndrome may experience symptoms related to memory loss, mood changes, and/or heightened anxiety. *Id.* While Plaintiff did not present with most of the symptoms Dr. Pello had associated with post-concussive syndrome at the time of her examination, she reported to Dr. Pello that she still experienced occasional headaches and memory lapses as of the date of her examination. *See* ECF 34-3 at 2. Dr. Pello stated he based his diagnosis on "[his] educational experience, her subjective reports and the records that support this," and, that his diagnosis was one of "exclusion and deduction based on the temporal relationship of when the onset started, relatively immediately following the motor-vehicle accident." *See* ECF 34-1 at 87.

Defendant argues Dr. Pello's opinion is unreliable as to the post-concussive syndrome diagnosis because it is based on the Plaintiff's own subjective report and his "clinical exam findings," which Defendant contends are also based on the Plaintiff's self-reporting. *See* ECF No. 34 at 18. Defendant argues Dr. Pello reached his opinion through a review of medical records that showed

relevant symptoms around the time of the accident, and despite not presenting with symptoms during his examination, Dr. Pello relied on these records and her self-reporting to conclude Plaintiff's symptoms were caused by the post-concussive syndrome. *Id.* at 18-19. Defendant also argues Dr. Pello did not adequately consider any alternative causes for Plaintiff's symptoms related to post-concussive syndrome, citing Plaintiff's intervening life events, in particular her pregnancy, childbirth, and care of her infant. *Id.* at 20-21. When asked about these potential alternative causes in his deposition, Dr. Pello stated they were not considered in his analysis, as he did not recall asking about her pregnancy, and that he was not sure that caring for an infant could cause headaches. *See* ECF No. 34-1 at 82.

The Court will not preclude Dr. Pello's opinion as to Plaintiff's post-concussive syndrome under the liberal reliability standards of Rule 702 and *Daubert*. In reaching his diagnosis of Plaintiff's post-concussive syndrome, Dr. Pello relied on his own educational experience, medical records from before and after the accident, which included records showing diagnosis and treatment of concussion symptoms following the accident, and a physical examination of the Plaintiff. And while Plaintiff did not present with most of the symptoms Dr. Pello associates with post-concussive symptoms at the time of Plaintiff's examination, she did self-report to Dr. Pello that she still experienced occasional headaches and memory loss. Dr. Pello then explained in his deposition that his diagnosis was based on her self-reporting and his clinical exam findings. Dr. Pello stated he relies on those same two criteria when treating his patients for post-concussive syndrome. *Id.* at 50.

As to Defendant's argument that Dr. Pello failed to consider alternative causes of the post-concussive syndrome, Dr. Pello stated he reviewed records from other providers who treated Plaintiff for her concussion symptoms following the accident, and when asked specifically about alternative causes of memory loss, he stated his diagnosis was one of "exclusion and deduction based on the temporal relationship of when the onset started, relatively immediately following the [accident]." *Id.*

at 87. He could not recall discussing childbirth or childcare with the Plaintiff, but he did state that he asked Plaintiff, as he asks all of his patients, about any pre-existing injuries or any condition post-accident that might result in a head injury or brain trauma.

Applying the liberal and flexible approach reflected in Rule 702 and *Daubert*, the Court is satisfied that Dr. Pello's methodology was reliable and will therefore not preclude his testimony as to Plaintiff's post-concussive syndrome diagnosis. The Court is not persuaded that Dr. Pello's failure to probe into Plaintiff's pregnancy, her childbirth or care of her child and address them in his report renders his opinion unreliable. And if Defendant believes Dr. Pello's testimony relies on insufficient methodology, they can challenge his opinions through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . ." *Daubert*, 509 U.S. at 596.

### 2. Post-Traumatic Headaches

Similar to his diagnosis of post-concussive syndrome, Dr. Pello stated he relied on Plaintiff's subjective reporting and "clinical exam findings" to reach his diagnosis of post-traumatic headaches. ECF 34-1 at 50. At his deposition, Dr. Pello testified that he focused on the temporal relationship between the accident and the onset of Plaintiff's headaches, and the lack of any pre-existing history of migraine headaches. *Id.* at 79. He then stated his belief that outside of any accident or brain injury incurred between the 2019 accident and the Plaintiff's examination, he did not believe Plaintiff's headaches could be caused by anything else. *Id.* at 80.

Defendant argues Dr. Pello's opinion as to Plaintiff's diagnosis of post-traumatic headaches is unreliable for the same reasons addressed above – Dr. Pello's diagnosis was based on self-reporting and Dr. Pello did not perform an adequate differential diagnosis. The Court reaches a similar conclusion as discussed above regarding Dr. Pello's post-concussive syndrome diagnosis. Dr. Pello reviewed Plaintiff's medical records, which documented similar findings, and physically examined Plaintiff. And while Plaintiff did not present with any symptoms of post-traumatic headaches on that

date, she did report that she still experiences headaches approximately 1-2 times per month, which last multiple hours per episode, and are associated with photophobia. ECF 34-3 at 2. Dr. Pello also stated that he asked Plaintiff about any pre-existing head injuries or conditions since the accident that might cause a head injury. Applying the liberal and flexible approach of Rule 702 and *Daubert*, the Court finds Dr. Pello has presented sufficient methodology to present his conclusions as to Plaintiff's diagnosis of posttraumatic headaches.

### 3. Ocular Motor Dysfunction

In his report, Dr. Pello cited Plaintiff's post-accident medical records that showed she experienced "impairment of ocular motor function, including trouble with saccadic eye movements and tracking/smooth pursuit." *Id.* at 2. In his deposition, Dr. Pello explained that ocular motor function relates to eye movements. *See* ECF 34-1 at 76. Dr. Pello explained that saccadic eye movements occur when the eyes jump from one spot to another, and that tracking and smooth pursuit refers to the eye's ability to follow an object, side to side and upon and down. *Id.* Dr. Pello stated that ocular motor dysfunction, as well as blurry vision, are commonly associated with concussions. During his examination of Plaintiff, he found her pupils to be "equal, round and reactive to light," and that her "extraocular muscles [were] intact."

Defendant argues Dr. Pello's opinion is unreliable because Plaintiff did not present with any symptoms of ocular motor dysfunction on the date of her exam with Dr. Pello that would warrant such a diagnosis, and as such this diagnosis was based purely on hearsay in the form of Plaintiff's medical records. *See* ECF No. 34 at 24. Defendant states that when asked generally why he would diagnose a condition that has resolved, Dr. Pello stated "it still happened. So I wanted it noted that it was part of the accident that she sustained, which required treatment, but it has resolved at this time." *Id.*

The Court reaches a different conclusion as to this diagnosis. While Dr. Pello reviewed

Plaintiff's post-accident medical records that showed ocular motor dysfunction symptoms, his physical examination of Plaintiff did not reveal present symptoms, nor did Plaintiff report ongoing symptoms related to ocular function, according to the report. Plaintiff has also not provided any explanation or theory as to how this diagnosis is reliable, given the apparent distinction between the post-accident medical records and Plaintiff's symptoms or lack thereof reported during the examination. In fact, Plaintiff did not respond to Defendant's arguments at all regarding the reliability of Dr. Pello's ocular motor dysfunction diagnosis. Plaintiff simply argues this issue, and the others raised by Defendant in their motion, go to the weight of the evidence, not its admissibility. The Court is not persuaded. While the Rules of Evidence reflect a liberal and flexible approach to expert testimony, a witness's testimony is reliable only if it is founded upon "good grounds." *See UGI Sunbury LLC*, 949 F.3d at 834. Plaintiff has failed to meet her burden to establish Dr. Pello's ocular motor dysfunction diagnosis is reliable. Accordingly, Dr. Pello's testimony regarding this diagnosis will be precluded.

4. Cervical sprain/strain

As part of his review process, Dr. Pello reviewed records from an MRI that was taken of Plaintiff's cervical spine dated June 3, 2020. *See* ECF 34-3 at 1. These records revealed a "disc bulge at C5-6 with bilateral neural foraminal narrowing." *Id.* During her exam with Dr. Pello, Plaintiff reported she still experiences "left-sided neck pain," and at the time of her examination presented with tenderness in that area. *Id.* at 2-3. Additionally, Dr. Pello's report notes Plaintiff reported seeing a chiropractor for treatment for a short time prior to October 31, 2019 for "stress-related neck tension." *Id.* at 2. Based on the records reviewed, and her self-reporting of the neck pain, Dr. Pello diagnosed Plaintiff with cervical sprain/strain. Dr. Pello did acknowledge Plaintiff had a history of neck pain prior to the auto accident, but that the accident "further aggravated her neck pain." *Id.* at 3.

Defendant argues this opinion is unreliable because Plaintiff's cervical spine issues were pre-existing and documented through her treatment with Dr. Kashain Srisuro ("Dr. Srisuro"). *See* ECF No. 34 at 25. Defendant claims Dr. Pello should have conducted an analysis into Plaintiff's pre-existing injury before concluding the pre-existing injury was exacerbated by the auto accident. *Id.* at 25-26. Defendant states that Dr. Pello did not review the records from Dr. Srisuro, nor did he review the deposition testimony of Plaintiff, where she references the pre-existing condition. *Id.* at 25. Defendant argues that when a Plaintiff suffers from a pre-existing injury, an expert must investigate the pre-existing condition before making any conclusions regarding the pre-existing condition and causation. *Id.* at 26. Defendant relies on the Eleventh Circuit's decision in *Cooper v. Marten Transport, Ltd.* for support. 539 Fed. Appx. 963 (11th Cir. 2013). In *Cooper* the Court affirmed a District Court's exclusion of expert testimony from plaintiff's treating physicians, who opined that plaintiffs' injuries were caused by a 2010 auto accident after conducting physical examinations of the plaintiffs and reviewing their medical histories. *Id.* at 967. In excluding the testimony the Court focused on the physicians' failure to "systematically and scientifically rule out" out other potential causes that were present, which included an auto accident that occurred one year prior, and documented pre-existing conditions. *Id.* (internal citation omitted). The Court stated that such a methodology "amounted to simple reliance on a temporal relationship." *Id.* ("The doctors concluded that, because the [Plaintiffs] did not manifest their specific injuries or need for surgery until after the 2010 collision, the 2010 collision was the cause of those injuries.").

The Court finds *Cooper* persuasive. Despite learning that Plaintiff had been treated for her neck pain prior to the accident, Dr. Pello diagnosed Plaintiff with cervical strain/sprain and attributed the diagnosis to the accident, stating that the accident aggravated her neck pain. Plaintiff, like the plaintiffs in *Cooper*, had a pre-existing condition that could very well affect Dr. Pello's causation analysis, and Dr. Pello was made aware of this pre-existing condition prior to rendering his opinion.

And in *Cooper*, the 11th Circuit affirmed exclusion of testimony even though the physicians had reviewed the plaintiffs' medical histories and records from the earlier accident. *Id.* at 966. While Dr. Pello did review 982 pages of medical records for the Plaintiff, he did not review records from Dr. Srisuro, which referenced Plaintiff's treatment for her cervical spine issues. Plaintiff was treated by Dr. Srisuro before and after the accident. Dr. Pello also did not review Plaintiff's deposition in reaching his conclusion, which also referenced her pre-accident neck pain. In sum, Dr. Pello became aware that Plaintiff had pre-existing neck pain that had been treated prior to the accident. Without reviewing the records related to this treatment, Dr. Pello attributed her ongoing symptoms to the accident. In doing so, Dr. Pello failed to thoroughly consider an alternative cause provided by the Plaintiff. This does not constitute the "good grounds" required for a reliable opinion. *See UGI Sunbury LLC*, 949 F.3d at 834. Additionally, Plaintiff did not address Defendant's arguments regarding this diagnosis in her response. Accordingly, Dr. Pello will be precluded from testifying as to his diagnosis of cervical sprain/strain.

### 5. Left-shoulder sprain/strain and Myofascial pain

In his diagnosis following Plaintiff's physical examination, Dr. Pello stated that Plaintiff's left shoulder sprain/strain had improved. He also diagnosed Plaintiff with myofascial pain. As he concluded with his other diagnoses, he attributed them to the accident. As to Plaintiff's left shoulder sprain/strain, during his examination of Plaintiff Dr. Pello noted that "[Plaintiff] is no longer experiencing left shoulder pain." *See* ECF 34-3 at 2. In his deposition he stated that the condition had resolved at the time of his examination. *See* ECF No. 34-1 at 113.

Defendant argues this diagnosis is unreliable because the condition had resolved by the time of the examination, and that such a present diagnosis, without any evidence, is inappropriate. *See* ECF No. 34 at 27. Defendant again cites to Dr. Pello's general statement that his intent in diagnosing a condition that was not present was to opine that Plaintiff had experienced the condition in the past,

based on his review of medical records. *Id.* Plaintiff's only applicable response is that this issue, like the others raised by Defendant, go to the weight of the evidence, and not its admissibility. As discussed above, the Court is not persuaded by this argument. The party offering expert testimony has the burden of establishing the requirements of expert testimony are satisfied. *See Padillas*, 186 F.3d at 418. Plaintiff has failed to meet this burden in demonstrating to the Court how or why Dr. Pello's opinion regarding this diagnosis is reliable. Accordingly, Dr. Pello's opinion as to this diagnosis will be precluded.

With respect to myofascial pain, Dr. Pello stated this condition is "interchangeable with muscular pain." *See* ECF No. 34-1 at 114. He states he was able to provide that diagnosis because of "the patient's report of pain over the neck and left trapezius muscle and tenderness to palpitation." *Id*. He stated that myofascial spasming was a symptom, and that he observed the spasming during Plaintiff's examination. *Id.* When asked if the condition could be related to the disc bulge he observed in the MRI, he stated that it could be related but that he could not attribute the condition to that injury. *Id.* at 104.

Defendants argue this opinion is unreliable because it fails to consider other potential causes. *See* ECF No. 34 at 28. Defendant points to Dr. Pello's statement regarding the MRI, as well as his statement that Plaintiff could have developed spasming due to "tension in that area." *See id.* at 28; ECF 34-1 at 105. Defendant argues that the tension in that area was the reason for her pre-accident treatment with a chiropractor, and as such an investigation into potential alternative causes was warranted. *See* ECF No. 34 at 28. The Court agrees. One of the symptoms Dr. Pello associates with myofascial pain is neck pain. And as the Court discussed above, Plaintiff reported during her examination that she had been treated for neck pain prior to the accident. We reach a similar conclusion here, in that Dr. Pello, after being provided with information as to Plaintiff's prior treatment for her neck pain, failed to investigate a potential pre-existing condition and attributed

Plaintiff's myofascial pain to the accident. Moreover, Plaintiff did not address this argument in her response, thus failing to meet her burden to establish the reliability of this opinion. Accordingly, Dr. Pello's opinion as to Plaintiff's myofascial pain diagnosis is precluded.

## V.     CONCLUSION

The Court finds the opinions of Kolmus and Dr. Nobilini reliable, and as such denies Plaintiff's motions. The Court finds the opinions of Dr. Pello regarding post-concussive syndrome and post-traumatic headaches reliable. The Court finds Dr. Pello's opinions regarding ocular motor dysfunction, cervical sprain/strain, left shoulder sprain/strain and myofascial pain to be unreliable, and as such these opinions will be precluded at trial. Defendant's motion is therefore denied in part and granted in part.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge