**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

JASMIN CHEBBANI,                                 :
                              Plaintiff,          :
                                                  :
              v.                                  :         Civil No. 5:21-cv-04298-JMG
                                                  :
UNITED STATES OF AMERICA                          :
DEPARTMENT OF AGRICULTURE,                        :
                              Defendant.          :

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                    **October 11, 2023**

## I.      INTRODUCTION

This is a negligence action against the United States arising under the Federal Tort

Claims Act ("FTCA").  Plaintiff Jasmin Chebbani alleges that she suffered injuries as a result of

an automobile accident that occurred on October 31, 2019, when her vehicle was struck by

another vehicle driven by Tammy Shoemaker.  Ms. Shoemaker was an employee of the United

States Department of Agriculture and was acting within the scope of her employment at the time

of the accident.  Plaintiff alleges that as a direct and proximate result of the accident she has

suffered a concussion, post-concussion syndrome, as well as neck and shoulder pain.

## II.     PROCEDURAL HISTORY

Plaintiff initiated this action on September 30, 2021 by filing a complaint against the

United States, Tammy Shoemaker, and John Doe/ABC Corporation.  *See* ECF No. 1.  An

Amended Complaint was then filed against the United States on November 22, 2021.  *See* ECF

No. 5.  Plaintiff later filed motions to preclude the testimony and opinions of Russell Kolmus and

Dr. Robert J. Nobilini on November 14, 2022.  *See* ECF Nos. 23 & 24.  Defendant filed a motion

to preclude the testimony of Dr. Scott Pello on February 16, 2023.  *See* ECF No. 34.  By Order

dated May 1, 2023, the Court denied Plaintiff's motions and granted Defendant's motion in part,

precluding Dr. Pello from testifying as to Plaintiff's neck and shoulder injuries, as well as ocular

motor dysfunction.  *See* ECF No. 52.

      Following the Court's opinion, the parties were instructed to file pre-trial briefings

regarding the state of Pennsylvania law regarding the use of expert testimony to establish

causation and damages, and whether Plaintiff should be permitted to offer lay testimony to

establish said causation and damages.  The parties submitted said briefings on May 10 and 11,

2023.  *See* ECF Nos. 58–59.  The Court then indicated to the parties that it would permit lay

testimony from Plaintiff regarding her injuries, but the Court would defer judgment on the legal

and factual sufficiency of this testimony until its final ruling.

      Additionally, the parties filed motions in limine on April 20 and 27, 2023.  *See* ECF Nos.

43–50.  In an Order dated May 17, 2023, the Court denied Plaintiff's Motion in Limine to

Determine the Amount of Wage Loss Claimed by Plaintiff, and denied as moot Plaintiff's

Motion in Limine Preclude Any Argument, Suggestion, Testimony, Evidence or Negative

Inference Concerning the Lack of Testimony from Dr. Brian McDonald, DO.  *See* ECF No. 61.

The Court granted Defendant's Motion in Limine to Preclude Property Damages, and granted as

unopposed Defendant's Motion for a Ruling in Plaintiff's Limited Tort Election, Motion to

Preclude Plaintiff from Presenting Evidence on Future Medical Expenses, and Defendant's

Motion to Preclude Evidence of Dental and/or Orthodontic Damages.  *Id.*

      A bench trial was held from May 22, 2023 through May 24, 2023.  The parties

subsequently filed proposed findings of fact and conclusions of law, ECF Nos. 71, 72, and on

August 1, 2023 presented oral argument.  The following findings of fact and conclusions of law

are based upon the evidence presented at trial, the parties' submissions, and the arguments advanced by counsel.  For the reasons set forth below, judgment in the amount of $43,519.90 is entered in favor of Plaintiff and against the United States.

### III.   FINDINGS OF FACT[1]

#### A.  Parties

1.      Plaintiff was born in Germany in 1985 and was 37 years old at the time of the trial.  Stipulations of Counsel ("Stipulations"), ECF No. 40–6 at ¶¶ 2–3; Trial Transcript, May 22, 2023 ("Tr. Trans. 1") at 33:9–23.

2.      Plaintiff was raised in Germany, where she graduated from high school with a certification as a dental assistant.  Stipulations at ¶ 3; Tr. Trans. 1 at 81:13–82:3.

3.      Plaintiff arrived in the United States in 2005.  Stipulations at ¶ 4; Tr. Trans. 1 at 33:24–25.

4.      In 2007, Plaintiff married Edwin Haas and was known during their marriage as Jasmin Haas.  Stipulations at ¶ 5; Tr. Trans. 1 at 82:12–13, 89:3–4.

5.      In 2012, Plaintiff purchased a used, white 2010 Mazda 3 four-door sedan ("Mazda").  Stipulations at ¶ 6.

6.      From approximately 2012 to 2016, Plaintiff worked as an office manager at Reardon Dental, a dental office in Phoenixville, PA.  Tr. Trans. 1 at 82:17–25.

7.      During her time at Reardon Dental she befriended Revera Wudie ("Wudie"), who was a part-time dental hygienist.  Tr. Trans. 1 at 95:17–24, 96:8–10, 97:2–6; Trial Transcript, May 24, 2023 ("Tr. Trans. 3") at 61:5–8.

---

[1] The Findings of Fact are substantially derived from the parties' Proposed Findings of Fact filed at ECF Nos. 71 & 72.

3

8.      Plaintiff and Ms. Wudie became close friends, communicating frequently through phone calls and text messages.  Plaintiff visited Ms. Wudie at her home and knew Ms. Wudie's husband, and Ms. Wudie's daughter knew Plaintiff has "Auntie Jasmin."  Tr. Trans. 1 at 96:8–97:1.

9.      In or around 2016, Plaintiff briefly worked as a dental assistant to Dr. Kunaal Goyal, the owner of the Allendale Dental practice, which at all times relevant was located in the same complex as King of Prussia Dental Associates at 491 Allendale Road.  Stipulations at ¶7; Tr. Trans. 1 at 83:1–14, 83:21–84:6.

10.     In or around December 2017 Plaintiff became a patient at Allendale Dental and remains a patient to this day.  Stipulations at ¶ 8; Tr. Trans. 1 at 84:7–12.

11.     In March OF 2018 Plaintiff applied for a position as a full-time regional sales manager at Karl Schumacher Dental, LLC ("KSD"), a subsidiary of Hu-Friedy Manufacturing Co., LLC.  Tr. Trans. 1 at 85:13–86:1, 89:5–24; Joint. Ex. 5 at 0036–0041.

12.     Plaintiff was subsequently hired by KSD as a sales manager for the mid-Atlantic region and was responsible for sales in Pennsylvania, Delaware, Maryland, the District of Columbia, Virginia, and West Virginia.  Tr. Trans. 1 at 35:1–2, 91:21–92:11.

13.     Her job at KSD required her to travel most days to dental and oral surgery offices in those states with frequent overnight trips, and required her to fly one or two times per month. *Id.* at 98:6–16, 108:16–22.

14.     Ms. Shoemaker was employed as a Consumer Safety Inspector for the United States Department of Agriculture ("USDA") on October 31, 2019.  Stipulations at ¶ 15; Trial Transcript, May 23, 2023 ("Tr. Trans. 2") at 11:22–12:1, 21:8–9, 23:8–17.

15.     Ms. Shoemaker's job required her to travel to meat processing and slaughtering plants to confirm they were following USDA guidelines.  Tr. Trans. 2 at 21:17–19.

16.     In 2019 the job required Ms. Shoemaker to travel daily to three different establishments.  *Id.* at 22:13–17.

**B.   Pre-Accident Events and Treatment Received**

17.     In or around the spring of 2019, Plaintiff began taking a Muay Thai kickboxing class at Algeo MMA & Kickboxing ("Algeo") in King of Prussia, PA.  Tr. Trans. 1 at 101:23–25, 102:8–19.

18.     Plaintiff attended classes at Algeo one to two times per month.  *Id.* at 102:10–19.

19.     Within a few months she began dating her class instructor, Alfonso Monturano.  *Id.* at 102:25–103:13.

20.     In fall 2019, prior to the accident, Plaintiff and Mr. Monturano moved into a rental home together near Einstein Medical Center.  *Id.* at 103:15–23.

21.     On or about August 1, 2019, Plaintiff, while working for KSD, was walking on a sidewalk and looking at her cellphone when a car swerved on to the sidewalk and hit Plaintiff with its sideview mirror, causing her to fall to the ground.  *Id.* at 65:9–25.

22.     Plaintiff reported the accident to her supervisor, KSD supervisor Jon Watsabaugh, who advised her that KSD policy required her to file a report of the incident for workers' compensation purposes.  *Id.* at 66:8–17.

23.     Plaintiff was aware the information she reported to Mr. Watsabaugh about any accident or incident would form the basis of a report to the KSD workers' compensation carrier.  *Id.* at 178:17–22.

### C. Pre-Collision Treatment with Dr. Srisuro

24.     In or around September 2019, Mr. Monturano recommended Plaintiff visit a chiropractor he knew from Algeo, Dr. Kashain Srisuro, who owned a practice named Comfort Care Chiropractic.  *Id.* at 105:25–106:13.

25.     At the time, Plaintiff was experiencing pain in her neck and shoulders, which she attributed to stress related to her divorce.  *Id.* at 42:14–16.

26.     Plaintiff began chiropractic treatment with Dr. Srisuro on September 25, 2019. Stipulations at ¶ 12.

27.     On that date Plaintiff complained of neck and shoulder pain.  Joint Ex. 7 at 0003–0004; Tr. Trans. 1 at 107:22–108:6.

28.     Following her examination, Dr. Srisuro diagnosed Plaintiff with "Cervicalgia," "Pain in Right Shoulder," "Pain in Left Shoulder," "Myalgia and Myositis," and "Segmental Dysfunction Cervical Region," and recommended twice-weekly chiropractic treatment.  Joint Ex. 7 at 0003–0004; Tr. Trans. 1 at 107:6–18; 109:10–19.

29.     With the exception of the shoulder pain diagnoses, Plaintiff did not know what the other conditions diagnosed meant.  Tr. Trans. 1 at 107:6–18.

30.     Dr. Srisoruo took x-rays of Plaintiff's cervical, thoracic and lumbar spine during the September 25 visit.  Joint Ex. 7 at 0005.

31.     With respect to Plaintiff's cervical spine, Dr. Srisuro found, *inter alia*, "A mild loss of intervertebral disc space height…present between the levels of C4–C6"; "Mild anterior inferior osteophyte formation…on the vertebral body of C6"; "loss of the normal lordotic nerve"; "Encroachment of the neuroforamina is apparent, especially at the level of C4–C7"; "Discopathy

in cervical spine"; and "Rotational malposition subluxations were noted at C2, C5–7, T5, T11–12, L1, L4–5." *Id.* at 0005–0006; Tr. Trans. 1 at 110:6–111:22; 112:5–14.

32.     Plaintiff also did not know what these findings meant.  *Id.*

33.     Plaintiff continued her treatment with Dr. Srisuro on the following dates leading up to the accident: September 30, and October 2, 4, 9, 11, 15, 17, 21, and 28, 2019.  Joint Ex. 7 at 0003–0018; Tr. Trans. 1 at 112:22–113:1.

**D. Collision on October 31, 2019**

34.     On October 31, 2019, Plaintiff was driving her Mazda alone and was stopped at a red light near the intersection of South Gulph Road and Long Road in King of Prussia, PA.  Tr. Trans. 1 at 10:10–11; 24:25–25:2, 25:15–16.

35.     Plaintiff was wearing her seatbelt at the time of the accident.  Tr. Trans. 1 at 118:19–20.

36.     She was stopped immediately in front of Ms. Shoemaker, who was driving a government issued 2017 Ford Focus ("Focus").  Stipulations at ¶ 15; Tr. Trans. 2 at 10:9–21, 23:8–17.

37.     Plaintiff testified that she was working for KSD at the time of the collision and was going from one dental office to another in King of Prussia, but could not recall where she was coming from, what time she left, or where she was going.  Tr. Trans. 1 at 35:8–10, 118:1–10.

38.     It was raining lightly, and the road was saturated and covered in wet leaves.  Tr. Trans. 2 at 25:8–11.

39.     When the light turned green, Plaintiff moved her vehicle forward a short distance, then stopped.  *Id.* at 10:9–21; 27:15–18; 28:2–5.

40.     Ms. Shoemaker began to drive and then applied her brakes.  *Id.* at 10:9–21; 14:11–14.

41.     When she applied the brakes, the antilock brakes activated which shook the vehicle, and the Focus then slid a short distance on the wet asphalt.  *Id.* at 10:9–21.

42.     Ms. Shoemaker turned to the right to avoid a collision, but her vehicle's front bumper struck the rear bumper of Plaintiff's Mazda.  *Id.* at 10:9–21, 14:11–14, 14:25–15:1, 28:2–5, 28:11–13, 28:25–29:3.

43.     Plaintiff's Mazda was equipped with airbags, but they did not deploy during the accident.  Tr. Trans. 1 at 129:23–130:1.

44.     Immediately following the accident, Plaintiff turned her vehicle right at the intersection onto Long Road, where she parked along the shoulder.  *Id.* at 36:5–11, 130:5–15; Tr. Trans. 2 at 17:21–23.

45.     Ms. Shoemaker followed and parked behind Plaintiff on the shoulder.  *Id.*

46.     Following the accident, at approximately 11:31 AM, Plaintiff called 911 while sitting in her vehicle and reported a two-vehicle accident with no injuries, and that both vehicles had pulled to the side of the road.  Tr. Trans. 1 at 36:5–11, 127:22–128:2, 131:7–15; Tr. Trans. 2 at 18:1–2; Joint Ex. 11 at 0005.

47.     Plaintiff testified that the accident took place at approximately 11:30 AM.  Tr. Trans. 1 at 134:25–135:2, 136:25–137:2.

48.     According to telephone records, Plaintiff had placed a phone call to Mr. Monturano at approximately 11:29 AM, which lasted approximately one minute.  *Id.* at 136:4–21; Joint Ex. 11 at 0005.

49.     Plaintiff testified that although she placed the call, the two did not speak and she was not speaking with anyone over the phone when the accident occurred.  Tr. Trans. 1 at 136:17–21, 137:3–7.

50.     Plaintiff testified that when in her car she would use her Bluetooth at all times. *Id.* at 135:3–7.

51.     Approximately ten minutes later police arrived on the scene.  *Id.* at 138:13–15; Tr. Trans. 2 at 17:24–25, 33:20–21; Joint Ex. 9.

52.     Ms. Shoemaker informed police that she had to call her supervisor to report the accident.  Tr. Trans. 2 at 18:5–20.

53.     Her supervisor directed her to take photos of both vehicles, which she did.  *Id.* at 31:2–32:25; Joint Ex. 8.

54.     On the accident scene, a police officer asked Plaintiff if she was okay, and she responded that she was.  Tr. Trans. 1 at 143:24–144:2.

55.     Ms. Shoemaker later heard Plaintiff tell a police officer that Ms. Shoemaker's car "hit her so hard her head bounced off the steering wheel."  Tr. Trans. 2 at 18:5–20, 34:12–20.

56.     When the police officer walked away from Plaintiff, Ms. Shoemaker approached her and asked if she told the officer she hit her head on the steering wheel.  *Id.* at 18:5–20, 35:4–14.

57.     Plaintiff confirmed that she made that statement to the officer.  *Id.*

58.     Ms. Shoemaker asked Plaintiff if she needed to go to the hospital, and Plaintiff replied that she did not.  *Id.* at 35:5–14.

59.     Plaintiff stated she would "take a Tylenol or something for the pain."  *Id.*

60.     Plaintiff did not lose consciousness during the accident, did not experience any bleeding as a result of the accident, and did not have any scrapes or cuts.  Tr. Trans. 1 at 139:12–18, 140:12–15.

61.     She did not suffer amnesia and did not experience dizziness, numbness, tingling, or weakness as a result of the accident.  *Id.* at 139:14–16, 140:10–11, 167:19–21.

62.     Plaintiff was able to walk around the scene of the accident without assistance and communicate with Ms. Shoemaker and police, and was able to operate her vehicle after the accident.  *Id.* at 140:1–9, 130:5–10, 148:16–149:6.

63.     Plaintiff was also able to exit her vehicle without assistance.  *Id.* at 139:21–25.

64.     Following the accident, Plaintiff left the scene and went to Allendale Dental located at 491 Allendale Road in King of Prussia, PA.  *Id.* at 38:16–23; 83:6–11; 84:13–25; 149:9–14.

65.     Plaintiff was concerned about damage to her teeth during the accident, and was examined by Dr. Goyal.  *Id.* at 38:13–20, 149:9–16.

66.     Plaintiff's records from Allendale Dental do not show Plaintiff received an examination or any treatment on that date.  *Id.* at 151:6–8; Joint Ex. 4.

67.     Plaintiff had planned to go to lunch with Ms. Wudie that day.  Tr. Trans. 3 at 61:5–19.

68.     Ms. Wudie worked at King of Prussia Dental Associates, which was also located at 491 Allendale Road.  *Id.* at 60:13–61:1.

69.     Plaintiff arrived at Ms. Wudie's office at approximately 1:00PM, and then they both went to lunch at Naf Naf Grill.  *Id.* at 62:1–3, 63:2–5.

70.     Ms. Wudie drove them both to and from the restaurant.  *Id.* at 65:5–6.

71.    Ms. Wudie observed that Plaintiff "seemed a little bit off" and "didn't seem okay when she sat … on the chair." *Id.* at 62:5–8, 62:19–24.

72.    Ms. Wudie further observed that Plaintiff appeared to be in a "daze." *Id.* at 65:24–66:4.

73.    During lunch Plaintiff told Ms. Wudie about the accident, informing her that she was hit from behind by a federally owned vehicle and the driver of the other vehicle could not produce insurance. *Id.* at 63:6–13.

74.    After lunch was over, Ms. Wudie drove them both back to the parking lot of 491 Allendale Road and Ms. Wudie returned to work.  Id. at 63:14–20.

75.    Plaintiff then left the parking lot.  *Id.*

76.    Plaintiff did not recall going to lunch with Ms. Wudie on that date.  Tr. Trans. 1 at 152:15–25.

77.    Plaintiff went to Einstein Medical Center ("Einstein"), which was "three houses down" from her home at the time.  Tr. Trans. 1 at 39:10–16.

78.    Plaintiff checked into the Emergency Room at approximately 2:25PM.  *Id.* at 164:4–6; Joint. Ex. 1 at 0014.

79.    She reported having nausea, a headache, and one episode of vomiting.  Joint Ex. 1 at 0013–0015; Tr. Trans. 1 at 166:1–12, 167:8–10, 167:19–24.[2]

80.    She also reported "neck pain on the left side."  Joint Ex. 1 at 0013–15.

81.    Plaintiff provided an account of the accident to the ER, stating that she was at a red light and rear ended, and that her face hit the steering wheel.  *Id.* at 0014.

---

[2] Records indicate she reported vomiting at home.  Tr. Trans. 1 at 39:5–10.  She testified she went home after the accident, but also couldn't remember the lunch.  *Id.*; Tr. Trans. 1 at 269:7–120.

82.    An Einstein physician conducted a full examination of Plaintiff and found full range of motion in her neck and normal neurological function.  *Id.* at 172:5–21; Joint Ex. 1 at 0013–0015.

83.    The physician deferred any imaging at the time.  *Id.* at 0015.

84.    Plaintiff was prescribed Zofran for nausea and Tylenol for the pain and discharged at approximately 3:41 PM, with instructions to follow up with her primary care physician.  Tr. Trans. 1 at 171:11–172:21; Joint Ex. 1 at 0013–0015.

85.    Plaintiff was diagnosed with a muscle strain.  Joint Ex. 1 at 0015; Tr. Trans. 1 at 172:5–11.

86.    Between 11:24 AM and the end of the day on October 31, 2019, Plaintiff participated in 58 calls or text messages on her cellphone.  Joint Ex. 11 at 0005, 0010.

**E.  Friday, November 1, 2019**

87.    Plaintiff did not return to work on the day following the accident.  Tr. Trans. 1 at 40:7–10, 176:21–177:3.

88.    On Friday, November 1, Plaintiff called her supervisor Mr. Watsabaugh to report the accident.  *Id.* at 177:4–14.

89.    Mr. Watsabaugh informed Plaintiff that he needed to fill out a report of the accident as per KSD policy, which Plaintiff was aware of from her prior accident she had to report.  *Id.* at 177:4–21.

90.    Mr. Watsabaugh asked Plaintiff a series of questions, and the answers formed the basis of a report he compiled entitled "First Report of Accident/Incident."  *Id.* at 177:22–178:4, 181:21–23; Joint Ex. 5 at 0004.

91.    The following information was taken from Plaintiff during this interview:

    a. While stopped at a red light her vehicle was struck by another driver's vehicle that was traveling at approximately 45 miles per hour.

    b. The other driver stated the vehicle was a government vehicle and thus not subject to inspection.

    c. The other driver stated she had been experiencing problems with her government vehicle.

    d. Plaintiff had been vomiting that was induced by trauma and concussion.

    e. Plaintiff had hit her head on the steering wheel when her vehicle was struck from behind.

    f. Plaintiff went right to the dentist from the accident and then went to the ER.

Joint Ex. 5 at 0004.

92. Plaintiff reviewed the report and was given the opportunity to make corrections before it was finalized.  Tr. Trans. 1 at 178:5–16.

93. Plaintiff knew from her prior experience that the report would form the basis of a workers' compensation claim.  *Id.* at 178:17–22.

**F. Sunday, November 3, 2019**

94. Over the next several days, Plaintiff continued to experience headaches and vomiting.  *Id.* at 41:11–15.

95. That weekend, she began to experience "fogginess, dizziness and blurry vision." *Id.*

96. She also experienced left-sided neck pain that "came and went."  *Id.* at 41:23–25.

97. On Sunday November 3rd, Plaintiff drove to church and then to the home of Ms. Wudie.  *Id.* at 40:14–25, 159:8–20.

98.     Plaintiff and Ms. Wudie then went shopping at King of Prussia Mall.  *Id.* at 159:8–20.

99.     While she was shopping, Plaintiff began to "feel funny," so she had Ms. Wudie drive to the Einstein ER later that evening.  *Id.* at 40:13–41:3, 195:14–196:12.

100.    Plaintiff was first seen at the ER at approximately 8:44 PM.  *Id.* at 195:11–13; Joint Ex. 1 at 0017–0023.

101.    She reported that since the accident she had experienced "a persistent frontal headache that [was] associated with nausea as well as several episodes of vomiting," she was "photophobic and phonophobic," and she had "a general sense of fogginess."  Joint Ex. 1 at 0017.

102.    She denied any vision changes, weakness, numbness, or tingling.  *Id.*

103.    Plaintiff again reported she hit her head on the steering wheel during the accident. *Id.*

104.     Plaintiff was examined by an Einstein physician, who noted Plaintiff had normal neurologic functioning.  *Id.* at 0018.

105.    No imaging was ordered during this emergency room visit.  *Id.*

106.    Plaintiff was given an injection which included Diphenhydramine and Metoclopramide, and an oral tablet of acetaminophen.  *Id.*

107.    Plaintiff was also given a prescription for ibuprofen and acetaminophen.  *Id.* at 0022.

108.    Plaintiff was diagnosed with a concussion and instructed to follow up with her primary care physician, Dr. Jennifer Dupre "for followup appointment with neurology to discuss [her] persistent concussion symptoms."  *Id.* at 0019.

109.    Plaintiff did not fill the prescription for ibuprofen until two weeks later, and there is no record of Plaintiff filling the prescription for acetaminophen.  Joint Ex. 3 at 0006.

110.    On Sunday, November 3, 2019, Plaintiff participated in 105 calls or text messages on her cell phone.  Joint Ex. 11 at 0006, 0011–0013.

### G.  Monday, November 4, 2019

111.    On November 4, 2019, Plaintiff did not travel to work, but took calls from doctors at home.  Tr. Trans. 1 at 209:6–11, 216:1–5.

112.    On that date, she returned to Dr. Srisuro for examination and treatment.  *Id.* at 209:17–18; Joint Ex. 7 at 0019–0021.

113.    She reported that she had been in a car accident on October 31, 2019, that Ms. Shoemaker's vehicle was traveling at a speed of 30 mph when it struck her vehicle, and that her head hit the steering wheel during the accident.  Tr. Trans. 1 at 209:17–18, 211:15–18, 212:15–17; Joint Ex. 7 at 0019–0021.

114.    Among the symptoms Plaintiff reported to Dr. Srisuro were neck pain, left shoulder pain, loss of balance, blurry vision, dizziness, and "jaw popping."  Tr. Trans. 1 at 214:4–215:3; Joint Ex. 7 at 0019–0021.

115.    Plaintiff also stated she had difficulty looking at screens and driving, and that she was having trouble sleeping.  Joint Ex. 7 at 0019.

116.    Plaintiff complained that her pain was interfering with her work.  *Id.*

117.    When asked to clarify at trial, Plaintiff stated "Yes I was – by doing work, like I said, I got phone calls from doctors.  I can't shut that off."  Tr. Trans. 1 at 216:1–5.

118.    The records from the visit state the following: "She rates her neck pain at 7 out of 10 with 10 being the worse pain.  The duration of pain is constant (100% of the time).  She rates

her left shoulder pain at 6 out of 10 with 10 being the worse pain.  The duration of pain is frequent (75% of the time)."  Joint Ex. 7 at 0020.

119.    Plaintiff was diagnosed with "Cervicalgia," "Pain in Left Shoulder," "Cervical Sprain," "Sprain of Left Shoulder Joint," "Myalgia and Myositis," and "Segmental Dysfunction Cervical Region."  *Id.* at 0019.

120.    Except for the diagnosis of cervical sprain, these were the same conditions Plaintiff was diagnosed with on September 25, 2019.  Tr. Trans. 1 at 210:13–211:5; Compare Joint Ex. 7 at 0003–0004 with 0019-0021.

121.    Prior to the accident, Plaintiff's shoulder pain was identified as "bilateral" on several occasions.  Joint Ex. 7 at 0003–0014.

122.    Dr. Srisuro also took x-rays on that date, and the findings included: "A mild loss of intervertebral disc space height … present between the levels of C4–C6"; "Mild anterior inferior osteophyte formation is noted on the vertebral body of C6"; "reversal of normal lordotic curve"; "Encroachment of the neuroforamina is apparent, especially at the level of C4–C7"; and "Increased flexion that is noted at the level of C5/6 in the lateral cervical flexion view, possibly due to ligamentous laxity."  *Id.* at 0022.

123.    Dr. Srisuro recommended Plaintiff continue treatment with him "three to four times per week."  *Id.* at 21.

124.    Dr. Srisuro further stated "[it] is within a reasonable degree of chiropractic certainty that her injuries are a direct result of the motor vehicle accident that occurred on October 21, 2019."  *Id.* at 0021.

125.    Plaintiff continued to visit Dr. Srisuro for treatment until he closed his practice due to the COVID-19 pandemic.  Tr. Trans. 1 at 61:9–13.

### H.  Friday, November 8, 2019

126.   On Friday November 8, 2019, Plaintiff visited her primary care physician Dr. Jennifer Dupre.  *Id.* at 224:11–13; Joint Ex. 14 at 002–003.

127.   Plaintiff reported she was in a motor vehicle accident on October 31, 2019 and that during the collision her head hit the steering wheel.  Joint Ex. 14 at 002.

128.   Plaintiff also reported she was experiencing the following: continued nausea (though no vomiting since Monday), continued significant frontal headaches during the day, fatigue, difficulty concentrating, and sensitivity to bright light but not sound.  *Id.*

129.   For example, while travelling to New York by train for a business trip, Plaintiff had to exit early due to her symptoms: "[My] head was killing me and I felt very nauseous." Tr. Trans. 1 at 55:25–56:4.

130.   Plaintiff stated she had not returned to work since the day of the accident.  Tr. Trans. 1 at 230:17–19.

131.   Plaintiff did not report any neck or shoulder pain to Dr. Dupre on that date.  *Id.* at 227:8–11; Joint Ex. 14 at 002–003.

132.   Dr. Dupre diagnosed Plaintiff with post-concussion syndrome.  Tr. Trans. 1 at 227:13–21; Joint Ex. 14 at 002–003.

133.   Dr. Dupre referred Plaintiff to Dr. Brian McDonald at Bryn Mawr Rehabilitation Hospital ("BMRH") for further treatment.  Tr. Trans. 1 at 227:22–24; Joint Ex. 14 at 0003.

### I.  Plaintiff's Additional Medical Care

134.   Plaintiff first saw Dr. McDonald for a physiatry consultation on November 13, 2019.  Tr. Trans. 1 at 227:25–228:3; Joint Ex. 15 at 0073–0080.

135.    Plaintiff reported she was involved in a rear-end motor vehicle accident and that her head struck the steering wheel during the accident.  Joint Ex. 15 at 0074.

136.    Plaintiff also stated that she had attempted to return to work part time, "albeit with increased symptoms," and that she had not started driving again because of increased symptoms. *Id.*

137.    Plaintiff was administered a "SCAT 5" test, by which she was asked to self-report the severity of a range of symptoms commonly associated with brain injury.  *Id.* at 0078.

138.    Plaintiff scored an 86 out of a possible 132, rating as "severe" the following symptoms: headache, dizziness, blurred vision, sensitivity to light, feeling slowed down, feeling like "in a fog," "don't feel right," difficulty concentrating, difficulty remembering, drowsiness, feeling more emotional, and trouble falling asleep.  *Id.*; Tr. Trans. 1 at 229:21–230:4, 231:17–233:1.

139.    Dr. McDonald diagnosed Plaintiff with concussion, post-traumatic headaches, neck pain, dizziness, oculomotor dysfunction, cognitive impairment, and insomnia.  Joint Ex. 15 at 0079.

140.    Dr. McDonald recommended that Plaintiff undergo a "concussion therapy program" which included "physical therapy, occupational therapy and vestibular therapy."  *Id.*

141.    Plaintiff was also prescribed Amitriptyline and Imitrex (Sumatriptan) to treat her headaches.  *Id.* at 0079.

142.    Dr. McDonald stated in his report that Plaintiff was not cleared to return to work or resume driving.  *Id.* at 0079.

143.    Plaintiff was also referred for a neuropsychological evaluation at BMRH.  *Id.*

144.    On November 14th, Plaintiff presented at BMRH for an occupational therapy

evaluation for the treatment of Dr. McDonald's diagnosis of Ocular Motor Dysfunction.  Joint

Ex. 17 at 0002–36.

145.    The occupational therapist recommended an extended course of treatment, and

Plaintiff subsequently attended occupational therapy appointments on the following dates:

November 14, 21, and 27, 2019; December 12, 13, 17, 20, and 26, 2019; January 6, 8, 13, 15, 20,

22, and 29, 2020; and February 5, 2020.  *Id.* at 0002–324.

146.    With respect to Dr. McDonald's referral for vestibular therapy, Plaintiff was

evaluated on November 21, 2019 for treatment of concussion-related symptoms.  Joint Ex. 16 at

0040–69.

147.    Following her evaluation, Plaintiff was directed to start 12 weeks of twice-weekly

vestibular therapy treatment at BMRH.  *Id.*

148.    Plaintiff attended those appointments on the following dates: November 21 and

27, 2019; December 6, 12, 13, 17, 20, and 26, 2019; January 6, 8, 13, 15, 20, 22, and 29, 2020;

February 11, 14, 18, and 25, 2020; March 6 and 11, 2020; April 16 and 22, 2020; and May 6,

2020.  Joint Ex. 16 at 0049–69, 0091–119, 0140–65, 0214–51, 0252–75, 0316–41, 0342–62,

0402–25, 0433–51, 0468–500, 0517–34, 0577–94, 0619–46, 0664–81, 0765–94, 0815–34, 0852–

71, 0955–87, 0988–1021, 1070–96, 1112–39, 1260–90.

149.    With respect to Dr. McDonald's referral for a neuroosychological evaluation,

Plaintiff was evaluated on December 16, 2019 for treatment of concussion-related symptoms.

Tr. Trans. 1 at 243:8–19; Joint Ex. 12 at 1888–91.

150.    The neuropsychologist administered a battery of tests to Plaintiff with differing

results.  On a test that "requires her to repeat a series of digits forward," for example, Plaintiff

scored in the .4 percentile, meaning 99.6% of all persons performing that task scored higher than Plaintiff.  On another test "involving speeded visual motor sequencing of numbers," Plaintiff scored in the 98th percentile, meaning that only two percent of the population scored higher than her.  Tr. Trans. 1 at 245:13–246:24; Joint Ex. 12 at 1888–91.

### J.  Additional Treatment at BMRH

151.    Plaintiff's course of treatment at BMRH was supervised by Dr. McDonald, a physiatrist, and Christine McIntyre, a nurse practitioner, with whom she met on December 9, 2019, and January 6, February 7, March 6, May 1, June 12, July 24, and September 14, 2020. Tr. Trans. 1 at 233:9–234:6; Joint Ex. 15.

152.    Plaintiff's neuropsychological evaluation was reviewed by Nurse Practitioner McIntyre on January 6, 2020.  She noted that it "revealed weakness in verbal memory, auditory attention, and processing speed," among other issues. For treatment of those problems, Nurse Practitioner McIntyre directed Plaintiff begin a course of speech therapy at BMRH.  Joint Ex. 15 at 0056–63.

153.    Plaintiff attended an initial speech therapy evaluation on January 15, 2020, after which it was recommended she continue speech therapy at BMRH.  Joint Ex. 16 at 0555–76.

154.    Plaintiff attended those appointments on the following dates: January 15, 2020; February 5, 11, 18, and 25, 2020; March 4, 6, and 11, 2020; April 16, 22, and 27, 2020; and May 1 and 6, 2020.  *Id.* at 0555–576, 735–764, 835–851, 872–909, 938–954, 1022–1039, 1048–1069, 1097–1111, 1140–1154, 1179–1197, 1242–1259.

155.    Following the accident, Plaintiff continued to be treated by Dr. Srisuro for her cervical spine issues, namely, neck and shoulder pain.  Joint Ex. 7 at 0019–60.

156.    She received such treatment from Dr. Srisuro on the following dates: November 4, 6, 8, 13, 15, 18, 20, 22, 25, and 26, 2019; December 6, 9, 12, 16, 20, and 31, 2019; January 3, 8, 10, 15, 20, 22, 27, and 29, 2020; February 13, 2020; and March 5, 2020. *Id.*

157.    Dr. Srisuro's practice closed after Plaintiff's March 5th appointment due to the COVID-19 pandemic. Tr. Trans. 1 at 61:9–13.

158.    Once the practice closed, Plaintiff began treatment for her cervical spine issues with BMRH. Accordingly, on June 3, 2020, Nurse Practitioner McIntyre referred Plaintiff for an MRI of her cervical spine at Jefferson Healthcare. Joint Ex. 22.

159.    Following her review of the MRI results on June 12, 2020, Nurse Practitioner McIntyre ordered that Plaintiff begin a 12-week course of cervical spine therapy at BMRH. Joint Ex. 15 at 0019–27; Joint Ex. 16 at 1505–11.

160.    Plaintiff underwent cervical spine physical therapy up until July 24, 2020. Joint Ex. 16 at 1636.

161.    Throughout the entire course of Plaintiff's therapy, some of the activities involved in the treatment program would cause Plaintiff to develop a headache or become nauseous. Tr. Trans. 1 at 48:25–49:1; *see* Joint Ex. 16 at 0144.

162.    A physical therapy note dated February 25, 2020 states that Plaintiff "will begin exertional therapy tomorrow in order to return to [her] previous fitness routine." Joint Ex. 16 at 0857.

163.    That same note indicated Plaintiff had experienced an increase in headaches after her therapy session on that date, and that her everyday activities and work were being limited by "habituation, visual tracking, VOR and vertical displacement." *Id.* at 0856–57.

164.     Plaintiff's pre-accident fitness routine consisted of going for occasional walks, occasional participation in meditation and yoga exercises online, and attending a beginner kickboxing class once or twice a month.  Tr. Trans. 1 at 101:12 – 102:19.

165.     During a March 4, 2020 physical therapy session, Plaintiff reported her "previous level of function" as "participat[ing] in boxing and running 6 days a week."  Joint Ex. 16 at 0915.

166.     During a May 6, 2020 physical therapy session, Plaintiff reported her "goal is to return to resistance training and martial arts."  *Id*. at 1264.

167.     Plaintiff attended these "exertional" physical therapy session at BMRH on the following dates: March 4; April 16 and 27; May 1, 4, 6, 14, 15, 20, 22, and 29; June 1, 3, 10, and 12; July 2, 7, 9, and 24, 2020.  Joint Ex. 16 at 0910–0937, 1070–1096, 1155–1178, 1198–1241, 1260–1504, 1541–1657.

168.     The discharge notes from Plaintiff's physical, occupational and speech therapy programs state that Plaintiff was discharged because the "goals" of the programs were "met."  Joint Ex. 16 at 0709–717; 1245–1252; 1760–1765.

### K.  Plaintiff's Lost Wages

169.     Plaintiff was out of work from the day of the accident through Thanksgiving.  Tr. Trans. 1 at 52:2–5.

170.     On November 25, 2019, Dr. McDonald issued a "return to work note," opining that Plaintiff was "cleared for [return to work] part-time at 4 hrs/day 2 days/week as of 11/26/19," adding that if Plaintiff tolerated those work levels well, she could increase her work to "1/2 days 5 days a week on 12/2/19."  Joint Ex. 25 at 001; Tr. Trans. 1 at 52: 2–17.

22

171.    On December 9, 2019, Plaintiff was evaluated by McIntrye, who opined that Plaintiff "may continue to work a total of 20 hours a week from home only."  Joint Ex. 15 at 0070.

172.    Plaintiff was on Temporary Total Disability ("TTD") through November 25, 2019, and was then on Temporary Partial Disability ("TPD") through June 14, 2020.  Joint Ex. 27 at 003.

173.    She reported to PAWC missing work due to the accident, and PAWC made indemnity payments for missed work during the following time periods: November 1–3 and 13–25, 2019, for which she received indemnity payments totaling $1,880.16; December 8, 2019–January 3, 2020, for which she received an indemnity payment of $1,669.48; February 16–29, for which she received an indemnity payment of $632.14; March 1–14 and 15–28, for which she received indemnity payments totaling $1,264.28; April 12–25 and April 26–May 9, for which she received indemnity payments totaling $1,264.28; May 10–23, for which she received an indemnity payment of $1,037.34; May 24–June 6, for which she received an indemnity payment of $140; and June 7–14, 2020, for which she received an indemnity payment of $332.28.  Joint Ex. 27.

174.    Plaintiff was paid biweekly at KSD.  Pl. Ex. 4.

175.    Plaintiff testified that as a salaried employee her earnings statements would state that she worked 80 hours when she was working full-time.  Tr. Trans. 1 at 76:11–12; 116:22–117:1.

176.    For the pay period beginning October 27, 2019 and ending November 9, 2019, Plaintiff's earning statement showed she was paid as if she had worked a full-time schedule.  Pl. Ex. 4 at 0084.  She earned a salary of $2,431.18 and commissions of $3,847.64.  *Id.*

177.    Similarly, for the next two pay periods, which began November 10, 2019 and ended December 7, 2019, Plaintiff's earning statements showed she was compensated for working a full-time schedule.  *Id.* at 0085–86.

178.    For the pay periods beginning December 8, 2019 and ending January 4, 2020, Plaintiff's earning statements reflected part-time hours, as each statement stated she worked 40 hours as opposed to 80.  *Id.* at 0087–88.  She earned a total of $2,431.18 for this period.  *Id.*

179.    Regarding the pay period beginning December 8, 2019, Plaintiff testified she received a reduced salary because she was out of work.  Tr. Trans. 1 at 76:3–22.

180.    Plaintiff received an indemnity payment in the amount of $1,669.48 for the period of December 8, 2019 – January 3, 2020.  Joint Ex. 27 at 003.

181.    For the next three pay periods beginning January 5, 2020 and ending February 15, 2020, Plaintiff's earning statements showed she was compensated at a full-time rate.  *Id.* at 0089–91.

182.     For the next two pay periods beginning February 16, 2020 and ending March 14, 2020, Plaintiff's earning statements showed she was compensated at a part-time rate.  *Id.* at 0092, 0094.  She earned a salary of $3,038.98 for those two pay periods.  *Id.*

183.    Plaintiff received indemnity payments of $632.14 for the periods of February 16 to February 29, 2020, and March 1, 2020 through March 14, 2020.  Joint Ex. 27 at 003.

184.    Plaintiff was furloughed by KSD starting on or about March 15, 2020 due to the COVID-19 pandemic.  Tr. Trans. 1 at 104:24–105:6; Joint Ex. 16 at 1074 ("She reports she was furloughed from work at home for over a month due to COVID-19"); Joint Ex. 15 at 0030 ("She is currently partially furloughed from work.  She works every other week now.").

24

185.    The Workers' Compensation Lien includes a lien for $8,219.96 for the indemnity payments.  Joint Ex. 27.

### L.  Medical Expenses

186.     The Workers' Compensation Lien Ledger included a list of expenses for medical received following the accident, totaling $46,773.23.  Joint Ex. 27.

187.    The ledger included expenses from the following providers: [3]

    a.  Comfort Care Chiropractic between November 4, 2019 and March 5, 2020 in the amount of $5,531.98;

        1.  Each of these expenses were exclusively in the service of Plaintiff's neck and shoulder pain;

    b.  Conshohocken Family Practice from November 8, 2019 and November 22, 2019 in the amount of $202.62;

    c.  Einstein Montgomery for treatment on October 31, 2019 and November 3, 2019 in the amount of $1,474.02;

    d.  Einstein Practice Plan Inc. for treatment on October 31, 2019 and November 3, 2019 in the amount of $299.04;

---

[3] These figures are based on Joint Exhibit 27 and Plaintiff's Exhibit 2.  Plaintiff's Exhibit 2 includes the lien ledger from Joint Exhibit 27, but also includes the lien ledger's underlying billing statements.  Plaintiff's Exhibit 2 was contingently admitted into evidence on the first day of trial (subject to the Court's assessment) following Defendant's objection that it had not received the underlying billing statements until two weeks earlier.  Tr. Transcript 1 at 17:13–18:7, 19:18–20:3.  On the second day of trail, the Court heard arguments regarding the underlying billing statements again and admitted them pending any future objections regarding their use.  Tr. Transcript 2 at 43:22–44:2, 44:21–45:1, 46:25–47:4.  Defendant made no additional objection during, or since, trial.

e.  Express Scripts, Inc. for prescriptions of Amitriptyline and Sumatriptan filled between December 9, 2019 through February 19, 2020 in the amount of $272.71;

f.  Jefferson University Physicians and JOI Navy Yard for treatment received on June 3, 2020 in the amount of $655.11;

   1.  These expenses were exclusively in the service of Plaintiff's neck and shoulder pain;

g.  Mainline Healthcare for treatment received December 16, 2019 in the amount of $444.69;

h.  Bryn Mawr Rehabilitation for treatment received on the following dates, which totaled $37,306.99:

   1.  November 14, 21, and 27, 2019 totaling $1,874.49;

   2.  December 6, 12, 13, 17, 20 and 26, 2019 totaling $4,742.57;

   3.  June 1, 3, 10, 12 and 30, 2020 totaling $3,057.12;

   4.  January 6, 8, 13, 15, 20, 22, and 29, 2020 totaling $6,469.31;

   5.  February 5, 11, 14, 18, and 25, 2020 totaling $3,889.09;

   6.  July 2, 7, 9, 24, and 30, 2020 totaling $3,259.59;

   7.  August 3, 14, 18, and 28, 2020 totaling $2,458.37;

   8.  September 8, 2020 for $567.25;

   9.  March 4, 6, and 11, 2020 totaling $2,588.71;

   10. April 16, 22, and 27, 2020 totaling $2,747.68; and

   11. May 1, 4, 6, 14, 15, 20, 22, and 29, 2020 totaling $5,652.81.

i. Rehabilitation Associates of the Main Line, P.C. for treatment received between November 13, 2019 and September 14, 2020 in the amount of $586.07:

1. November 13, 2019 in the amount of $143.22;

2. December 9, 2019 in the amount of $54.93;

3. January 6, 2020 in the amount of $56.63;

4. February 7, 2020 in the amount of $56.63;

5. March 6, 2020 in the amount of $48.14;

6. May 1, 2020 in the amount of $56.63;

7. June 12, 2020 in the amount of $56.63;

8. July 24, 2020 in the amount of $56.63; and

9. September 14, 2020 in the amount of $56.63.

Pl. Ex. 2; Joint Ex. 27.

### M. Expert Testimony of Dr. Scott J. Pello, M.D.

188.    Dr. Scott J. Pello, who is board certified in neurology and pain medicine, gave trial testimony in this case on May 3, 2023.  *See* Court Exhibit 2 ("Pello Trans.").

189.    Dr. Pello owns a pain clinic with multiple locations throughout the Metropolitan Philadelphia area, and working with patients who receive workers' compensation benefits and are involved in related litigation is "a large part of [his] practice." *Id.* at 47:1–9, 63:5–18.

190.    Dr. Pello frequently testifies on behalf of the patients in his practice.  *Id*. at 63:19–64:16.

191.    Dr. Pello estimated that he provides expert deposition testimony four to eight times every month, which translates to 48 to 96 times per year.  *Id*.

192.    Dr. Pello was retained on behalf of Plaintiff in this litigation to offer a medical opinion regarding her alleged injuries.  *Id*. at 60:10–17.

193.    Dr. Pello examined Plaintiff on October 11, 2022.  *Id.* at 6:7–10, 73:21–25.

194.    Prior to examining Plaintiff, Dr. Pello reviewed approximately 969 pages of Plaintiff's medical records.  *Id.* at 72:18–20; 21–23.

195.    These included records from Bryn Mawr Hospital, Rehabilitation Associates, Comfort Care Chiropractic, Einstein Medical Center and the Rothman Institute.  *Id.* at 7:8–25, 105:25–106:2.

196.    Prior to his examination of Plaintiff, Dr. Pello reviewed medical records from Einstein that pre-date the October 31, 2019 accident.  *Id.* at 96:12–98:10; Joint Ex. 1 at 0001–12.

197.    During his examination of Plaintiff, Dr. Pello found that sensation in her extremities was normal.  Pello Trans. at 137:15–21.

198.    Dr. Pello found that Plaintiff's deep tendon reflexes were symmetric.  *Id*. at 138:2–6.

199.    Dr. Pello found that Plaintiff's gait was normal.  *Id*. at 138:7–9.

200.    Dr. Pello agreed that his neurologic examination of Plaintiff was normal.  *Id*. at 138:10–14.

201.    Dr. Pello opined that Plaintiff suffered a concussion, post-concussive syndrome, and post-traumatic headaches as a result of the accident.  *Id.* at 13:12–15, 20:2–21:3, 27:14–24, 139:9–16.

202.    Dr. Pello testified that his diagnoses of Plaintiff's post-concussive syndrome and post-traumatic headaches was based on Plaintiff's subjective report of symptoms.  *Id.* at 91:10–25, 163:4–9.

203.    Dr. Pello explained that in order to have post-concussive syndrome, an individual must first sustain a concussion.  *Id.* at 21:7–10.

204.    Specifically, post-concussive syndrome produces a "myriad" of symptoms and the criteria to diagnose a concussion involves an individual having a majority of these symptoms. *Id.* at 21:7–22:5.

205.    Dr. Pello stated these symptoms include "headaches, dizziness, nausea or vomiting, light, headedness, trouble with memory, focus, concentration, trouble finding the right words or other speech deficit, anxiety and insomnia."  *Id.* at 21:17–22:5.

206.    Dr. Pello testified that all of the symptoms experienced by Plaintiff following the accident are common symptoms of a concussion and that they are all related to "brain function." *Id.* at 33:1–4.

207.    Dr. Pello further testified that Plaintiff sustained a "serious impairment of her brain function" as a result of the motor vehicle collision. *Id.* at 33:7–8.

208.    Dr. Pello also testified that Plaintiff did have significant recovery through concussion therapy treatment, but still suffers from post-traumatic sequalae of the injury, which manifests as "a few headaches per month."  *Id.* at 28:8–9.

209.    Dr. Pello opined that the post-traumatic headaches are caused by the motor vehicle collision because Plaintiff had no history of headaches or headache disorder prior to the accident and there is no medical basis to attribute the headaches to "anything other than the accident."  *Id.* at 29:12–17.

210.    Dr. Pello opined that it is common for symptoms of a concussion to set in "over a few hours or even days," which could be due to adrenaline following an accident and the fact that post-concussive symptoms can simply have a "delayed onset."  *Id.* at 15:4–16:1.

211.    Dr. Pello reviewed more than 900 pages of medical records, but less than 1,000 pages.  *Id*. at 69:7–13; 72:18–20.

212.    Dr. Pello did not review any deposition testimony, including the deposition of Plaintiff.  *Id*. at 108:4–6; 120:7–10.

**N.   Defense Expert – Dr. Alexander Merkler, M.D.**

213.    Dr. Alexander Merkler is a board certified neurologist who was retained by Defendant and testified on behalf of Defendant in this case.  Tr. Trans. 2 at 170:15, 171:2–5, 216:11–12.

214.    Dr. Merkler reviewed medical records and other documents, including deposition testimony related to this case, and conducted an IME of Plaintiff on April 11, 2022.  *Id.* at 172:20–25, 174:13–20, 176:2–13, 199:22–25, 216:23–217:6.

215.    Dr. Merkler also reviewed Dr. Pello's expert report and his deposition testimony.  *Id.* at 174:24–175:4.

216.    In his opinion, Plaintiff did not believe "the motor vehicle accident on October 31st, 2019 led to any traumatic or permanent brain injury, including any complaints that [Plaintiff] currently has, including headache, concentration, [and/or] impairment."  *Id.* at 175:17–20.

217.    When asked on direct examination if he inquired as to why Plaintiff believed she suffered a concussion as a result of the motor vehicle collision, Dr. Merkler testified "I would assume it's from hitting her head on the steering wheel, but I didn't directly ask that specific question."  *Id.* at 178:16–18.

218.    Dr. Merkler testified that common symptoms of a concussion include "loss of consciousness, amnesia or loss of memory of the event, either before or after the event,"

"confusion," "disorientation," "blurry vision," "memory problems," "headaches," "nausea,"
"vomiting," "insomnia," "concentration difficulty," "vertigo," "focal neurological deficits," and
"seizures." *Id.* at 179:9–19.

219.    Dr. Merkler testified there is a wide spectrum of symptoms that exist with a
concussion and mild traumatic brain injury that may vary from person to person. *Id.* at 232:13–
19.

220.    Dr. Merkler stated that in patients with a mild traumatic brain injury and
symptoms consistent with a concussion, these symptoms may last days, weeks, or in some cases,
several months. *Id.* at 250:22–251:10.

221.    He also stated that even in the case of a mild traumatic brain injury, it may have a
significant effect on a person's life. *Id.* at 251:15–19.

222.    To be diagnosed with a concussion, a patient must at least meet criteria within the
definition of a mild traumatic brain injury, as defined by such institutions as the American
Congress of Rehabilitation Medicine, which states that one of the following must be present: (1)
a period of loss of consciousness; (2) any loss of memory for events immediately before or after
the accident; (3) any alteration in mental state at the time of the accident (feeling dazed,
disoriented, or confused); or (4) focal neurological deficit that may or may not be transient,
meaning that the focal deficit does not need to be permanent. *Id.* at 179:11–19, 221:6–19.

223.    Dr. Merkler testified that a patient who suffers a traumatic brain injury in a car
accident may experience amnesia with respect to the time immediately before or after the
accident. *Id.* at 225:12–226:17.

224.    Dr. Merkler explained that patients can subsequently develop symptoms such as headache, nausea and vomiting, dizziness, insomnia, memory problems, concentration difficulty, vertigo, emotionality, and changes in personality.  *Id.* at 217:7–15.

225.    Dr. Merkler explained that these symptoms cannot be causally related to a concussion unless there was an objective injury to the brain as identified by those symptoms that occur acutely/immediately following the accident/trauma.  *Id.* at 222:24–223:1, 224:12–21.

226.    Dr. Merkler that opined he did not believe the motor vehicle accident "led to any traumatic or permanent brain injury, including any complaints that she currently has, including headache, concetration, impairment."  *Id.* at 175:16–22.

227.    Dr. Merkler found that Plaintiff's symptoms are incongruent with a traumatic brain injury, which suggests her complaints are due to an alternative cause.  *Id.* at 194:15–20, 212:11–213:12.

228.    Dr. Merkler found inconsistency between Plaintiff's self-reported symptoms and the objective data.  *Id.* at 215:8–15.

229.    Dr. Merkler found that Plaintiff was cognizant throughout the accident. She did not lose consciousness, did not have a seizure, and had no amnesia related to the accident.  *Id.* at 202:9–12.

230.    Dr. Merkler found that Plaintiff was able to recount details of the accident, both immediately after the accident, at her deposition, and at her IME with Dr. Merkler.  *Id.* at 177:10–14.

231.    Dr. Merkler testified that patients who have sustained a concussion are not able to safely drive or drive at all.  *Id.* at 180:14–21, 261:6–19.

232.    Dr. Merkler testified that patients who have sustained a concussion are not able to repeatedly view cell phone screens.  *Id.* at 214:10–20.

233.    Reviewing Plaintiff's records from Einstein, Dr. Merkler opined that her neurologic examinations on October 31, 2019 and November 3, 2019 were both normal.  *Id.* at 184:2–15, 190:19–191:1, 258:3–10.

234.    Upon review of his records from Dr. Dupre, Dr. Merkler opined that Plaintiff's November 8, 2019 neurologic examination with Dr. Dupre was normal.  *Id.* at 197:4–12.

**O. Defense Expert – Dr. Robert Greenleaf**

235.    Dr. Greenleaf is board certified orthopedic surgeon with a specialty in spinal surgery, who testified on behalf of Defendant.  *Id.* at 116:3–16, 118:15–18.

236.    Dr. Greenleaf performed an IME of Plaintiff on June 13, 2022.  *Id.* at 142:23–143:4.

237.    During the IME, Dr. Greenleaf performed his own imaging of Plaintiff's cervical spine.  *Id.* at 119:1–9.

238.    Upon review of Plaintiff's medical records and the IME, Dr. Greenleaf concluded Plaintiff did not experience any permanent or serious injuries to the cervical spine and left shoulder that could be attributed to the motor vehicle accident on October 31, 2019.  *Id.* at 118:19–120:10.

239.    Dr. Greenleaf found that, prior to the October 31, 2019 motor vehicle accident, Plaintiff was already experiencing the same orthopedic issues that she complained of after the accident, albeit with some exacerbation of symptoms.  *Id.* at 131:10–22.

240.    Dr. Greenleaf explained that Dr. Srisuro's diagnoses prior to the accident were the same as his diagnoses after the accident, albeit with magnified symptom severity based on

Chebbani's self-report: "[Dr. Srisuro] continued with the same diagnos[e]s. He continued with the same treatments. The only minor change that I noted was that he added a treatment called neuromuscular reeducation, which is basically the fancy chiropractor lingo for massage and soft tissue work and trying to work out what we call trigger points. But again, my feeling is it's – it was the same conditions, the same disease, the same problems that were temporarily exacerbated by the accident." *Id*.

241.    Dr. Greenleaf found that the imaging taken by Dr. Srisuro prior to the accident was identical to the imaging taken after the accident. *Id.* at 133:8–10, 134:8–20.

242.    After personally reviewing the imaging, Dr. Greenleaf disagreed with Dr. Srisuro's opinion that the post-accident x-rays showed signs of ligamentous injury. *Id.* at 133:8–25, 134:7–18, 134:21–23.

243.    Imaging completed by Dr. Greenleaf at the June 13, 2022 IME was identical to the imaging completed by Dr. Srisuro prior to and immediately after the motor vehicle accident. *Id.* at 147:3–16, 148:17–149:2.

244.    During the IME, Chebbani reported the same symptoms that she reported prior to the accident in this case. *Id.* at 144:3–5.

245.    Dr. Greenleaf agreed that the diagnosis of neck pain following an injury is "a pretty simple diagnosis." *Id.* at 156:2–4.

**P.  Defense Witness – Russell J. Kolmus, III**

246.    Mr. Kolmus was called by Defendant to testify as an expert in the field of accident reconstruction. *Id.* at 63:9–11.

247.    As part of his accident reconstruction, Mr. Kolmus visited the location of the accident. *Id.* at 69:9–17.

248.    When viewing a photograph of Plaintiff's vehicle, Mr. Kolmus testified that the rear bumper of the vehicle driven by Plaintiff depicted "some paint transfer presumably from the accident." *Id.* at 73:8–13; Joint Ex. 8 at 0482.

249.    Mr. Kolmus stated the paint smear on Plaintiff's vehicle was approximately two feet wide, and that it presumably was from the Ford because it was the same color as the Ford. *Id.* at 74:11–19; Joint Ex. 8 at 0486.

250.    With respect to the paint smear, or transfer, Mr. Kolmus later stated he was assuming the paint transfer was the result of the accident, as the color matched the Focus and he was giving Plaintiff the benefit of the doubt.  *Id.* at 97:11–17.

251.    He testified that Plaintiff's vehicle was repaired after the incident, in that the "bumper cover" and "portions related to the bumper cover" were replaced.  *Id.* at 74:20–75:5.

252.    Reviewing a photograph of the Focus, Mr. Kolmus stated there was no transfer of paint from Plaintiff's vehicle to the Focus.  *Id.* at 76:17–23; Joint Ex. 8 at 0488.

253.    Mr. Kolmus also observed a crack in the grill of the front of the Focus, and opined that he did not believe it came from the accident – rather it was from an object being thrown or hurled at the vehicle.  *Id.* at 77:7–25.

254.    He stated that if this had been caused by the accident "the bumper would have been compressed and we would have seen a line…" *Id.* at 78:5–16.

255.    Mr. Kolmus testified he did not examine the vehicles involved in the accident, as they "were disposed of by the time I came onto the case."  *Id.* at 62:23–63:3, 79:15.

256.    When asked on direct examination whether an accident reconstruction could be accurate without examining the vehicles involved in the accident, Mr. Kolmus acknowledged that "accuracy is in degrees" and that if the actual vehicles were examined, there would be "a

better chance of identifying exactly what was damaged and how much it was damaged." *Id.* at 79:9–13.

257.    He testified that the relative velocity of the vehicles can be determined by using "stiffness coefficients" for the vehicles involved in the collision. *Id.* at 92:21–93:3.

258.    To calculate the damage from the accident Mr. Kolmus used a software platform called Edge FX, which has been commonly used in the field of accident reconstruction. *Id.* at 84:7–13.

259.    Mr. Kolmus testified as to his findings utilizing the Edge FX software with different velocities and corresponding penetration, and then comparing the damage depicted. *Id.* at 85:12–86:22.

260.    Based on his analysis, Mr. Kolmus concluded the contact velocity was less than five miles per hour. *Id.* at 86:23–87:1.

261.    Mr. Kolmus then explained he continued his analysis using a government regulation regarding contact with bumpers: 49 CFR, Chapter V, Part 581. *Id.* at 87:2–13.

262.    The coefficients Mr. Kolmus used were provided by Neptune Engineering, which uses crash test data from the National Highway Transportation Safety Board and then calculates the coefficients. *Id.* at 93:11–19.

263.    Mr. Kolmus did not have the stiffness coefficient for the Mazda 3. *Id.* at 93:4–6.

264.    He later stated that if he did have the stiffness coefficient for the vehicle his opinion would not change because there was no residual damage to the vehicles involved in the accident. *Id.* at 98:20–24.

265.    Mr. Kolmus testified that in the crash testing, they utilize a stationary concrete barrier and the vehicle strikes it at a speed of 35 miles per hour. *Id.* at 94:5–20.

266.    With respect to his findings, Mr. Kolmus testified the contact velocity did not indicate how fast Ms. Shoemaker's vehicle was driving, but rather the difference between the speed of the two vehicles.  *Id.* at 105:25–106:3.

### Q. Defense Expert - Dr. Robert J. Nobilini

267.    Dr. Nobilini is a consultant in the fields of mechanical engineering and biomechanics.  Tr. Trans. 3 at 7:25–8:2.

268.    Dr. Nobilini testified that he used Mr. Kolmus's findings as the starting point for his analysis, particularly that the closing speed between the two vehicles in the accident was three miles per hour.  *Id.* at 17:15–18.

269.    Based upon that closing speed, Dr. Nobilini performed a momentum analysis, wherein he was able to conclude the change in velocity of Plaintiff's car during the collision.  *Id.* at 17:19–18:8.

270.    Dr. Nobilini concluded the change in velocity was somewhere between 1.68 and 2.75 miles per hour.  *Id.*

271.    Dr. Nobilini explained the purpose of this analysis is "to determine the post-impact speed of the two vehicles after impact."  *Id.* at 18:9–17.

272.    He testified that the finding of 1.68 to 2.75 miles per hour meant that Plaintiff's vehicle went from zero to 2.75 miles per hour during the collision.  *Id.* at 20:25–21:3.

273.    In his analysis, Dr. Nobilini found that the average acceleration for Plaintiff's vehicle during the accident was .38–.84 gs, and that the peak acceleration for her vehicle was .76 to 1.67 gs.  *Id.* at 21:21–24, 22:20–22.

274.    Dr. Nobilini stated that people experience 1 g of force when they are standing stationary.  *Id.* at 23:19–25.

275.     Dr. Nobilini noted one of the studies he cited found that people in both a frontward and rear facing position accounted for between 1 g to 5.6 gs when they coughed, sneezed or hopped off a chair, and as such the accelerations Plaintiff experienced in this case were within normal range of living.  *Id.* at 24:7–16.

276.     Dr. Nobilini discussed the Allen study, which used human beings as participants in crash tests and found that when an automobile is hit from behind, the seat pushes into the subject's back, resulting in their head being pushed into the head rest.  *Id.* at 25:11–26:5.

277.     Dr. Nobilini then discussed the West study, which reported for an equivalent barrier speed of three miles per hour, which is higher than the barrier speed during the October 31, 2019 accident, the head didn't move far enough to hit the head rest.  *Id.* at 27:1–28:4.

278.     Citing the Sabo study, which involved more severe collisions at higher speeds, and Plaintiff's testimony that she sits about twelve inches from the steering wheel, Dr. Nobilini concluded she did not hit her head on the steering wheel.  *Id.* at 30:22–31:5.

279.     Dr. Nobilini then explained the Wayne State Concussion Tolerance Curve, which considers accelerations under 42 gs to be safe.  *Id.* at 31:23–32:10.  He then stated Plaintiff's acceleration was less than 2 gs, far below these limits.  *Id.*

280.     He testified that this data is used in automotive safety matters and in athletics.  *Id.* at 32:14–25.

281.     Dr. Nobilini found that based on the studies he consulted and the forces at play in this accident, Plaintiff's alleged injuries were not in line with his research.  *Id.* at 33:23–34:25.

282.     He testified that the cervical injuries did not occur because there was a normal physiological range.  *Id.* at 34:3–14.

283.    With respect to the left shoulder, he testified that that injury was probably caused by the seatbelt.  *Id.* at 34:15–25.

284.    On cross-examination, Dr. Nobilini could not say how Mr. Kolmus arrived at his conclusions in his report upon which Dr. Nobilini relied.  *Id.* at 43:4–9.

285.    Dr. Nobilini stated that he viewed materials from the case, and was relying on Mr. Kolmus as an expert.  *Id.*

### R. Plaintiff's Current Status

286.    Currently, Plaintiff still occasionally experiences headaches, which may occur once or twice per month and "can come out of nowhere."  Tr. Trans. 1 at 67:10–14.

287.    Plaintiff has worked as a sales manager for DMG America since March 2021.  *Id.* at 34:5–22.

## III.   DISCUSSION

### A. Evidentiary Objections

Prior to the trial, Defendant objected to Plaintiff's use of lay testimony to establish causation and damages as to her injuries related to neck and shoulder pain.  The parties were directed to submit pre-trial briefings on the issue.  Upon consideration of the parties' briefings submitted on May 10, 2023 and May 11, 2023, *see* ECF Nos. 56 & 57, the Court ruled that Plaintiff's lay testimony regarding her injuries would be permitted at trial, but deferred judgment as to the legal and factual sufficiency of the testimony until final ruling.  Additionally, prior to and during trial Plaintiff objected to the admissibility of the "Watsabaugh Report" contained in Joint Exhibit 5, and the police report from the scene of the accident.  *See* Joint Ex. 9.  The

exhibits were admitted at trial, with the understanding the parties would include legal arguments as to their admissibility in their proposed conclusions of law.

## 1.  Expert Testimony Requirement

"Pennsylvania common law requires plaintiffs to prove the existence of a causal relationship 'between the injury complained of and the alleged negligent act to be entitled to recover for the injury.'" *Schweikert v. Eagle*, No. CV 20-4310, 2022 WL 394751, at *3 (E.D. Pa. Feb. 9, 2022) (quoting *Lattanze v. Silverstrini*, 448 A.2d 605, 608 (Pa. Super. Ct. 1982)).  Expert testimony is required in most circumstances to prove causation.  *Id.*; *see Pasparage v. Progressive Specialty Ins. Co.*, No. 2:21-CV-00729, 2023 WL 185411, at *1 (W.D. Pa. Jan. 13, 2023) (citing *Lattanze*, 448 A.2d at 608).  Pennsylvania recognizes an exception to this rule where the causal relationship between the alleged negligent act and injury is obvious.  *Lattanze*, 448 A.2d at 608.  "An obvious causal relationship exists where the injuries are either immediate and direct or the natural and probable result of the alleged negligent act.  *Id.* (citations omitted).

"Cases in which expert testimony is not required typically share two common traits: (1) the plaintiff begins exhibiting symptoms of the injury 'immediately after the accident or within a relatively short time thereafter,' and (2) the alleged injury is 'the type one would reasonably expect to result from the accident in question.'"  *Bixler v. Lamendola*, No. 3:20-CV-1819, 2022 WL 2441567, at *4 (M.D. Pa. July 5, 2022) (citations omitted).  Expert testimony would be required, however, in a case "where there are complicated questions involving preexisting conditions."  *Id.* at *5 n.2; *see Houp v. United States*, No. 20-CV-432-MJH, 2021 WL 4894531, at *4 (W.D. Pa. Oct. 20, 2021) (plaintiff's "significant prior history" of "similar symptoms" necessitated expert testimony); *Myers v. Edwards*, No. 1:13-CV-00792, 2015 WL 507151, at *3

(M.D. Pa. Feb. 6, 2015) ("As a layman could not 'easily diagnose' the causal connection with respect to Plaintiff's alleged injuries, given the evidence in the record suggesting that Plaintiff may have had a pre-existing condition, expert medical testimony is ultimately necessary to prove causation.").

Here, given Plaintiff's pre-existing symptoms of neck and shoulder pain, expert testimony is required to establish causation and damages.  Plaintiff was treated for these symptoms by Dr. Srisuro beginning in September 2019, just over a month prior to the accident.  Plaintiff then continued her treatment with Dr. Srisuro for the same symptoms following the accident.  While these injuries may be of the type one might expect to result from a motor vehicle accident, they did not begin following the accident – they were preexisting.  *See Bixler*, 2022 WL 2441567 at *4.  As such, these injuries are not the type that a "layman could diagnose."  *See Myers*, 2015 WL 507151 at *3.  In sum, expert medical testimony was required to prove causation as to Plaintiff's neck and shoulder injuries.  Because Plaintiff could not produce such testimony, her claim with respect to these injuries fails.

### 2.  Watsabaugh Report

At trial, Defendant moved to introduce the "Watsabaugh Report" contained in Joint Exhibit 5.  This was a report created by Plaintiff's manager Mr. Watsabaugh the day after the accident.  The pertinent portion of the document was a summary of the accident.  This information was generated from an interview Mr. Watsbaugh conducted with Plaintiff on November 1, 2019.  Plaintiff objected to the use of the document on hearsay grounds.  Defendant argued it was admissible under both the business records hearsay exception, and as party admissions.  The report was admitted as an exhibit, but the parties were advised to submit

arguments regarding admissibility in their proposed conclusions of law.  Defendant included

these arguments in their proposed conclusions of law – Plaintiff did not.

The Court finds the Watsabaugh Report is a self-authenticated business record under

Rule 803(6).  Under Rule 803(6), "[a] record of an act, event, condition, opinion or diagnosis"

may be admissible at trial if:

> A. the record was made at or near the time by — or from information transmitted by — someone with knowledge;
> B. the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> C. making the record was a regular practice of that activity;
> D.  all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> E. the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6)(A)–(E).

Such records are "self-authenticating" when they are accompanied by "a certification of

the custodian or another qualified person that complies with a federal statute or a rule prescribed

by the Supreme Court."  Fed. R. Evid. 902(4), 902(11).  As indicated by the certification

accompanying Joint Exhibit 5, which contained the Watsabaugh Report, the records were created

at or near the time of the accident from information of someone with knowledge of the

occurrence or event or transmitted by a person with such knowledge, and was kept within the

company's regular course of business.  Joint Ex. 5 at 0001.  With respect to Plaintiff's statements

made during the interview and documented in the report, Defendant argues they are a statement

of a party opponent.  At trial, Plaintiff's counsel argued they could not be statements of a party

opponent if not adopted by the Plaintiff.  However, Plaintiff admitted to speaking with Mr.

Watsabaugh and providing answers to questions regarding the accident, which were then

summarized and recorded into the document.  Tr. Trans. 1 at 177:22–178:4.  Plaintiff recalled

seeing the form with the information she had provided and was given the opportunity to correct

any errors on the form.  Tr. Trans. 1 at 178:5–16.  The Court therefore finds that these statements

contained in the report are statements of a party opponent.  For these reasons, the Watsabaugh

Report is admitted.

### 3.  Police Report

Plaintiff also objected to the admission of Joint Ex. 9, the Police Report from the

accident.  Plaintiff objected to said evidence under 75 Pa. C.S. § 3751(b)(4), the Pennsylvania

statute that precludes the use of police accident reports in a civil proceeding arising from an

automobile accident.  "[T]he Third Circuit and district courts within this district have analyzed

the admissibility of Pennsylvania police reports under the Federal Rules of Evidence."  *Bailey v.

White*, No. CV 14-1951, 2017 WL 11570573, at *2 (E.D. Pa. Oct. 31, 2017) (citing *Clark v.

Clabaugh*, 20 F.3d 1290, 1293 (3d Cir. 1994); *Sonnier v. Field*, No. 05-14, 2007 WL 2155576, at

*6 (W.D. Pa. July 25, 2007)).  These reports have been found admissible as an exception to the

rule against hearsay for public records under Rule 803(8).  *See id.*; *Sonnier*, 2007 WL 2155576 at

*6.  Under Rule 803(8), "a record or statement of a public office" may be admissible if it sets out

"the office's activities, a matter observed while under a legal duty to report…a matter observed

by law-enforcement," or "factual findings from a legally authorized investigation," and the party

opposing admission "does not show that the source of information or other circumstances

indicate a lack of trustworthiness."  The Court finds these requirements were satisfied with

respect to Joint Exhibit 9.  Moreover, Plaintiff did not put forth any evidence to suggest the

police report was untrustworthy or unreliable.  In fact, Plaintiff also used the police report at

different points in the trial.  Tr. Trans. 1 at 264:12–17; Tr. Trans. 2 at 39:8–41:10, 229:23–230:2.

Therefore the exhibit is admitted.

## B.  Applicable Law

### 1.  FTCA & Negligence

The United States is immune from civil causes of action unless it explicitly consents to be

sued.  *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010).  The Federal Tort

Claims Act ("FCTA") operates as a limited waiver of sovereign immunity for tort claims against

the United States and "provides the exclusive remedy for nonconstitutional torts based on the

negligent or wrongful act or omission of any employee of the Government while acting within

the scope of his office or employment."  *Couden v. Duffe*, 446 F.3d 483, 498, n.10 (3d Cir. 2006)

(citing 28 U.S.C. § 2679(b)(1)).  At the time of the accident, Ms. Shoemaker was acting within

the scope of her duties as an employee of the United States Department of Agriculture.

Stipulations at ¶ 16.  Under the FTCA, the United States is liable to the plaintiff to the same

extent that a private person would be liable in accordance with the law of the place where the act

or omission occurred.  *See* 28 U.S.C. § 1346(b).  In an action under the FTCA, attorney's fees

are capped at twenty-five percent of any judgment in the plaintiff's favor.  *See* 28 U.S.C. § 2678.

Pursuant to 28 USC § 1346(b)(1), this Court has jurisdiction over this matter.  Additionally, as

the motor vehicle accident took place in Pennsylvania, the law of Pennsylvania governs.  *See* 28

U.S.C. § 1346(b)(1).

Under Pennsylvania law, the elements of a negligence cause of action are: "(1) a duty

owed to the plaintiff; (2) a breach of that duty by the defendant; (3) a causal connection between

the defendant's breach and the resulting injury; and (4) injury suffered by the plaintiff." *Est. of*

*Zimmerman v. Se. Pennsylvania Transp. Auth.*, 168 F.3d 680, 684 (3d Cir. 1999) (citing *Est. of*

*Swift v. Northeastern Hosp. of Phila.*, 456 Pa.Super. 330, 690 A.2d 719, 722 (1997)).  Defendant

concedes that it breached the duty owed to Plaintiff when Ms. Shoemaker struck the rear bumper

of Plaintiff's vehicle with her vehicle.  As the first two elements are satisfied, Plaintiff now must

prove causation and damages by a preponderance of the evidence.

      To establish the element of causation, a plaintiff must prove actual and proximate cause.

*Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 851 (3d Cir. 1995).  "Actual

causation is present when the alleged injury would not have occurred but for a certain act or

presence of a condition ... while proximate causation requires that the defendant's wrongful act

be a substantial factor in bringing about the plaintiff's harm."  *Auboug v. Eyre Bus Serv., Inc.*,

No. 2:20-CV-389, 2021 WL 5910481, at *7 (W.D. Pa. Dec. 14, 2021) (citations omitted). A

plaintiff must make this showing by a preponderance of the evidence.  *Brown v. United States*,

No. CIV.A. 3:07-0621, 2008 WL 2704615, at *7 (M.D. Pa. July 7, 2008) (citing *Baum v. United

States*, 541 F.Supp. 1349, 1351 (M.D.Pa.1982)).  "Proximate cause is a legal question which

tests whether 'the negligence, if any, was so remote that as a matter of law, the actor cannot be

held legally responsible for the harm which subsequently occurred.'"  *Jordan v. Pinamont*, No.

2:06-CV-03091-LDD, 2007 WL 9812894, at *2 (E.D. Pa. May 7, 2007) (quoting *Brown v.

Philadelphia College of Osteopathic Medicine*, 760 A.2d 863, 868–69 (Pa. Super. 2000) (internal

citation omitted)).  "[T]he mere occurrence of an injury does not prove negligence."  *Hamil v.

Bashline*, 481 Pa. 256, 264–65 (1978).  Instead, when a plaintiff establishes the defendant

breached a duty of care owed to plaintiff, the plaintiff must also show the defendant's conduct

was the proximate cause of her injury.  *Id.* at 265 (citations omitted).

      To prove damages, "a plaintiff must give a fact-finder evidence from which damages may

be calculated to a reasonable certainty."  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225–26 (3d

Cir. 2003) (internal quotations omitted).  An award for economic damages may include

compensation for medical expenses and lost wages.  *Torres v. United States*, No. 5:21-CV-

04953, 2023 WL 2368728, at \*22 (E.D. Pa. Mar. 6, 2023) (citing *Durosky v. United States*, No.

CIV. A. 3:07-CV-1828, 2008 WL 5104850 at \*7 (M.D. Pa. Dec. 1, 2008)).  An award of non-

economic damages may include "compensation for a plaintiff's physical pain and suffering,

mental anguish, inconvenience, and loss of enjoyment of life including reduction in life

expectancy."  *DeCarlo v. United States*, No. 4:00-CV-1059, 2002 WL 31499281, at \*34 (M.D.

Pa. Sept. 11, 2002).  Under Pennsylvania law, "a plaintiff is entitled to be compensated for all

past medical expenses reasonably and necessarily incurred and all future medical expenses

reasonably likely to be incurred for the treatment and care of his injuries."  *McDonald v. United*

*States*, 555 F. Supp. 935, 962 (M.D. Pa. 1983) (citations omitted).  With respect to lost wages, "a

plaintiff must establish a wage loss that is the result of the negligence of the defendant." *Mader*

*v. Duquesne Light Co.*, 2018 PA Super 323, 199 A.3d 1258, 1267 (2018), *aff'd*, 663 Pa. 201, 241

A.3d 600 (2020) (citing *Todd v. Bercini*, 371 Pa. 605, 607–08 (1952)).  A plaintiff must also

establish "with reasonable certainty and specificity" that they "could not perform her job duties."

*King v. Pulaski*, 710 A.2d 1200, 1206 (Pa. Super. Ct. 1998).

Defendant claims that Plaintiff was contributorily negligent by stopping her vehicle

suddenly after using her phone to call someone.  Under Pennsylvania state law, where a

plaintiff's own negligence contributes to an accident, "any damages sustained by the plaintiff

shall be diminished in proportion to the amount of negligence attributed to the plaintiff." 42 Pa.

C.S. § 7102(a).  "Cases construing Pennsylvania tort law have found that the sudden stoppage of

a vehicle on a roadway under adverse weather conditions may create factual issues concerning

negligence and may constitute a proximate cause of an accident involving rear end collisions

behind the stopped vehicle." *Doland v. Berrios*, No. CIV. A. 1:11-CV-1783, 2015 WL 433598,

at *5 (M.D. Pa. Feb. 3, 2015) (citing *Gensemer v. Williams*, 419 F.2d 1361, 1362 (3d Cir. 1970)).

## 2. Pennsylvania Motor Vehicle Financial Responsibility Law

Under the Pennsylvania Motor Vehicle Financial Responsibility Law (the "PMVFRL"),

consumers may elect to purchase limited tort or full tort insurance coverage.  75 Pa. Stat. and

Cons. Stat. § 1705(a)(1).  With the full tort option, the insured "may seek recovery for all

medical and other out-of-pocket expenses and may also seek financial compensation for pain and

suffering and other nonmonetary damages as a result of injuries caused by other drivers." 75 Pa.

Stat. and Cons. Stat. Ann. § 1705(a)(1)(B).  Under the limited tort option, the insured "may seek

recovery for all medical and other out-of-pocket expenses, but not for pain and suffering or other

nonmonetary damages unless the injuries suffered fall within the definition of 'serious injury[.]'"

75 Pa. Stat. and Cons. Stat. § 1705(a)(1)(A).  The statute defines serious injury as "personal

injury resulting in death, serious impairment of body function or permanent serious

disfigurement." 75 Pa. Stat. and Cons. Stat. § 1702.  "Serious impairment of body function" is

not defined in the statute.

The inquiry into whether an injury results in "serious impairment of body function" is

two-fold:

> a. What body function, if any, was impaired because of injuries sustained
> in a motor vehicle accident?;
>
> b. Was the impairment of the body function serious? The focus of these
> inquiries is not on the injuries themselves, but on how the injuries affected
> a particular body function. Generally, medical testimony will be needed to
> establish the existence, extent, and permanency of the impairment ... In
> determining whether the impairment was serious, several factors should be
> considered: the extent of the impairment, the length of time the
> impairment lasted, the treatment required to correct the impairment, and
> any other relevant factors.  An impairment need not be permanent to be
> serious.

*Washington v. Baxter*, 553 Pa. 434, 447–48 (1998) (quoting *DiFranco v. Pickard*, 398 N.W.2d 896, 901 (Mich. 1986)).  A Plaintiff must "establish that [her] injuries resulted in such substantial interference with any bodily function as to permit a conclusion that the injuries have resulted in a serious impact on [her] life for an extended period of time."  *McGee v. Muldowney*, 750 A.2d 912, 915 (Pa. Super. Ct. 2000).  The limited tort defense is an affirmative defense.  *Sanderson-Cruz v. United States*, 88 F. Supp. 2d 388, 392 (E.D. Pa. 2000).

### 3.  Workers' Compensation Act

Under the Workers' Compensation Act ("WCA"), payments for individuals on total disability equal "sixty-six and two-thirds per centum of the wages of the injured employee." 77 P.S. § 511.  With respect to partial disability, payments equal sixty-six and two-thirds per centum of the difference between the wages of the injured employee…and the earning power of the employee thereafter."  77 P.S. § 512.  Wages are defined as the "average weekly wages of the employee."  77 P.S. § 582.

## IV.   ANALYSIS

Plaintiff brings this negligence action against the United States pursuant to the FTCA.  Accordingly, this Court has jurisdiction over the subject matter and the parties to this action pursuant to 28 U.S.C. § 1346(b)(1).  Venue is proper in this district because the motor vehicle accident on October 31, 2019 occurred in King of Prussia, Pennsylvania.  *See* 28 U.S.C. § 1391(b)(2).  Additionally, because the tort took place in Pennsylvania, the substantive law of Pennsylvania governs this action.  *See Barnes v. United States*, 685 F.2d 66, 68 (3d Cir. 1982).

Defendant does not dispute it breached a duty owed to Plaintiff when Ms. Shoemaker's vehicle struck Plaintiff's vehicle on October 31, 2019.  Therefore, the issues in this case are

whether the breach was the actual and proximate cause of Plaintiff's injuries, and what damages, if any, resulted from that breach.

### A. Scope of Recoverable Damages: The Pennsylvania Motor Vehicle Financial Responsibility Law

Plaintiff established by a preponderance of the evidence that she suffered a concussion and post-concussion syndrome, and that the accident on October 31, 2019 was the proximate cause of these injuries. The supporting evidence includes her statements to the responding police officer at the scene of the accident; records from her visits to the hospital on the day of the accident and three days later when she was diagnosed with a concussion; and records from her subsequent therapy that took place at Rehabilitation Associates of the Main Line, Maine Line Health, and Bryn Mawr Rehabilitation. For the reasons discussed below, these injuries were not serious. Therefore, while Plaintiff may recover damages related to these injuries, her damages will be limited.

With respect to the MVFRL, the parties do not dispute that Plaintiff had limited tort insurance coverage at the time of the accident. As such, Plaintiff may not recover non-economic damages, i.e., pain and suffering and other non-monetary damages, unless Plaintiff can establish that the concussion and post-concussion symptoms she suffered were "serious" under the MVFRL. Plaintiff has failed to establish by a preponderance of the evidence these injuries were "serious."

Plaintiff cannot show that her concussion and post-concussion syndrome caused "substantial interference with any bodily function." *See McGee*, 750 A.2d at 915. Beginning at the scene of the accident, Plaintiff was able to walk without difficulty, speak to both the responding officer on the scene and to Ms. Shoemaker, and take photographs of her vehicle. She

testified that she left the scene and drove to her dentist's office, which was located in the same medical center where Ms. Wudie worked.  Plaintiff later took herself to the Einstein ER after developing symptoms of nausea and vomiting.  Her ER examination showed normal neurologic function at the time, and imaging was deferred.  Plaintiff was prescribed medication for nausea and pain, and was discharged with instructions to follow up with her primary care physician. She returned to the emergency room on November 3, 2019 and was diagnosed with a concussion.  Plaintiff was out of work for several weeks following the accident and then returned to work on a part-time basis around Thanksgiving of 2019.  She was cleared to return to work full-time on June 12, 2020 and her earning statements show that Plaintiff resumed working full-time hours shortly thereafter.[4]   Plaintiff testified that she continues to experience headaches approximately once or twice per month that she attributes to the accident.  Her expert Dr. Pello also attributed the headaches to the accident.  Plaintiff did not present with any noticeable limitations at the time of trial.  Nor did she present evidence she has difficulty caring for herself or her family due to her injuries.   Plaintiff currently works as a sales manager for DMG America, a position she started in March of 2021.

With respect to her care following the accident, Plaintiff attended occupational, speech, and vestibular therapy sessions between November of 2019 and May 2020.  Plaintiff also attended physical therapy.  It should be noted that, during the period for which Plaintiff attended her therapy session, she was working on a part-time basis.  Moreover, Plaintiff's treatment and therapy did not require any invasive treatment or surgery.  And Plaintiff did not present evidence that she is currently being treated for her headaches that stem from her concussion.  Based upon

---

[4] Plaintiff's earnings statement for the pay period of June 21, 2020 through July 4, 2020 reflect a full-time work schedule.  It should be noted that Plaintiff was furloughed from her job on or about March 15, 2020, and was working a reduced schedule due to the furlough.

the facts of this case, Plaintiff has failed to establish by a preponderance of the evidence that her injuries caused a "substantial interference with any bodily function." *See McGee*, 750 A.2d at 915. Her damages are therefore limited to economic damages for her medical costs and lost wages.

### B.  Medical Costs

The lien ledger included $46,773.23 in medical expenses, for which Plaintiff claims the entirety. The Court concludes that Plaintiff is entitled to recover amounts paid for medical treatment she received for her concussion and post-concussion syndrome. And because the Court finds that Plaintiff continued to experience symptoms related to her concussion and post-concussion symptoms through June 2020, the Court finds these expenses to be reasonably necessary. Plaintiff is entitled to recover $40,586.14, which is the sum of medical expenses attributable to her concussion and post-concussion syndrome.

The lien ledger's remaining entries represent treatment exclusively for neck and shoulder pain, for which the Court concludes that Plaintiff may not recover. As the Court has previously ruled, expert medical testimony was required to prove causation as to injuries. Because Plaintiff could not produce such testimony, her claim with respect to these injuries fails and she may not recover the $6,187.09 associated exclusively with neck and shoulder pain.

### C.  Lost Wages

With respect to lost wages, Plaintiff represented she was out of work from the date of the accident until November 25, 2019, when she was cleared to return to work on a part time basis. She received payments through TTD in the amount $1,880.16 during this period. She was then on TPD until June 12, 2020. She received payments through TPD in the amount of $6,339.80 during this period. However, Plaintiff's earnings statements from November 2019 through June

2020 purport to show she was compensated at her full salary by her employer for several of the periods she was receiving payments through TTD and TPD.  Therefore, Plaintiff did not establish by a preponderance of the evidence that she lost wages during this whole period.

For example, during the first two periods for which Plaintiff received indemnity payments – November 1, 2019 through November 3, 2019 and November 13, 2019 through November 25, 2019 – the evidentiary record indicates that Plaintiff was compensated at her full salary.  Therefore, Plaintiff did not establish by a preponderance of the evidence that she lost wages during these periods.

She did establish by a preponderance of the evidence that she lost wages for the proceeding two periods of TPD: December 8, 2019 through January 4, 2020 and February 16 through March 14, 2020.  During these two periods, Plaintiff's earnings statements showed a decrease in hours worked, which she testified was due to her injuries stemming from the accident.  For these periods she received indemnity payments of $2,933.76.

However, for all remaining periods, Plaintiff did not prove by a preponderance that her wages lost were due to her injury and not to furlough status.  While Plaintiff was receiving payments from her TPD, the evidentiary record indicated Plaintiff was furloughed from KSD at or around March 15, 2020, and that she was working every other week as of May 1, 2020. Therefore, while Plaintiff's earning statements show a decrease in hours worked for the pay periods from March 15, 2020 through June of 2020, Plaintiff did not prove by a preponderance that her wages lost were due to her injury.

Accordingly, Plaintiff has established by a preponderance of the evidence that she is entitled to lost wages for the periods of December 8, 2019 through January 4, 2020 and February 16, 2020 through March 14,2020, which total $2,933.76.

## V.      CONCLUSIONS OF LAW

Ms. Shoemaker was an employee with the United States Department of Agriculture on October 31, 2019.  She owed a duty of care to Plaintiff.  Ms. Shoemaker, and by extension the United States government, breached that duty when her vehicle struck Plaintiff's vehicle. Plaintiff was injured in the collision.  She was not cleared to return to work in any capacity until November 25, 2019, when she was cleared to return part-time.  She was then cleared for return to work full-time on June 12, 2020.  Plaintiff established by a preponderance of the evidence that the accident was the actual and proximate cause of her concussion and post-concussion syndrome.  Because Plaintiff elected the "limited tort" option for motor vehicle insurance, under the MVFRL her injuries were not "serious" and she is only eligible to recover economic damages.  Plaintiff is entitled to the following damages: (1) $40,586.14 in medical costs; and (2) $2,933.76   in lost wages.  Judgment is entered in favor of Plaintiff and against the United States in the amount of $43,519.90.  An appropriate Order follows.


BY THE COURT:


_/s/ John M. Gallagher_
JOHN M. GALLAGHER
United States District Judge